[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-11187
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 25, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-01637 CV-TWT-1

LILLIE R. BATTLE, individually,
UNITED STATES OF AMERICA, ex rel,

                                        Plaintiffs-Appellants,

    versus

BOARD OF REGENTS FOR THE STATE OF GEORGIA,
JEANETTE K. HUFF,
OSCAR L. PRATER,

                                        Defendants-Appellees,

CYNTHIA SELLERS, in their individual and official
capacities as employees of the University System of
Georgia, jointly and severally,

                                        Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

**(October 25, 2006)**

Before EDMONDSON, Chief Judge, BLACK and FAY, Circuit Judges.

PER CURIAM:

Plaintiff Lillie Battle ("Plaintiff") appeals the district court's grant of summary judgment to Defendants Jeanette K. Huff and Oscar L. Prater ("Defendants"), against Plaintiff's First Amendment Retaliation and False Claims Act claims. We affirm.

## I. Background

Taking the record in the light most favorable to the Plaintiff, these events are the facts as they occurred. Plaintiff worked in the Office of Financial Aid and Veterans Affairs ("OFA") at Fort Valley State University ("FVSU") between 1987 and 1998. In Spring Quarter 1995, while working as a work study supervisor and veterans affairs counselor, Plaintiff began to observe and document what she believed were fraudulent practices in the Federal Work Study Program. Plaintiff took notes and made copies of suspicious documents, which she stored in a safe-deposit box at home. In January 1996, the OFA was reorganized; and Plaintiff's position changed to financial aid counselor. As part of Plaintiff's employment duties, she was required to verify the completion and accuracy of

2

student files as well as report any perceived fraudulent activity. Some student files previously handled by Plaintiff's supervisor, OFA Director Jeanette Huff ("Huff"), were transferred to Plaintiff. In examining these files, Plaintiff discovered "improprieties" pointing to what she believed was "Huff's fraudulent mishandling and mismanagement of Federal financial aid funds."

Plaintiff first confronted Huff about these improprieties in 1996, but Huff was dismissive and made no corrections. In late 1996, "overwhelmed" by the evidence of fraud, Plaintiff met with FVSU President Oscar Prater ("Prater") and told him that Huff was falsifying information, awarding financial aid to ineligible recipients, making excessive awards, and forging documents. Prater said nothing in response to Plaintiff's accusations and took no remedial steps. Plaintiff confronted Huff on other occasions with folders Plaintiff believed contained improprieties, but Huff made no corrections.

In March 1998, Plaintiff received a rating of "Exceeds Expectations" -- the second highest available category -- on her annual performance evaluation. The evaluation, however, also contained criticisms of Plaintiff's performance.[1] All of

[1]The evaluation criticized that (1) Plaintiff "allows student workers too much [sic] liberties and responsibilities," which "contributes largely to client dissatisfaction"; (2) Plaintiff needs "more self-confidence and assertiveness"; and (3) Plaintiffs' "performance has not lived up to her potential."

Plaintiff's prior evaluations had rated her performance as "Exceeds Requirements" or "Outstanding." Despite the high score, Plaintiff was not pleased with her 1998 evaluation.[2]

Plaintiff arranged a meeting with Huff's direct supervisor, FVSU Vice-President of Student Affairs Cynthia Sellers ("Sellers"), during which Plaintiff complained that her performance review was unfairly low. Sellers advised Plaintiff that, based on the score, Plaintiff's evaluation was not bad and that she would likely receive a raise. During the same meeting, Plaintiff told Sellers that "Huff was doing stuff that was going to get our institution in trouble" and awarding students aid for which they were ineligible. Plaintiff warned Sellers that she "was going to tell" unless changes were made. Sellers responded, "Do what you have to do." Plaintiff then scheduled a second meeting with President Prater to discuss her performance evaluation and "to reiterate the improprieties [of which she] had already informed him in prior years." During the meetings with Prater and Sellers, Plaintiff did not identify specific student files that had been

---

[2]In a letter dated 25 May 1998, Plaintiff wrote to Huff that she was not surprised she was being transferred due to "the negative, and unfair evaluation [she] received for the 1997-98 period." Plaintiff also wrote in the comment section of her 1998 evaluation that "I feel that I am being treated unfairly." The score on Plaintiff's 1998 evaluation was originally 3.54, but was increased by Huff to 3.7 after Plaintiff complained.

mishandled or provide documentary evidence -- which Plaintiff began collecting in 1995 -- to support her allegations of fraud.

On 25 May 1998, Plaintiff received a letter indicating the contract for her position as financial aid counselor would not be renewed effective 30 June 1998. The letter indicated Plaintiff had been approved for transfer to a position in a different FVSU department, but Plaintiff was later informed that no position was available. Plaintiff appealed the non-renewal of her contract through FVSU and the Board of Regents of the University System of Georgia, alleging her contract was not renewed because of her attempts to expose Huff's fraud. A grievance committee investigated, conducted an evidentiary hearing, and upheld the decision not to renew.

Plaintiff never spoke to anyone outside of FVSU about Huff's fraudulent activity until after she received notice that her contract would not be renewed. A month after receiving notice, Plaintiff met with the Department of Education ("DOE") and provided sixty-one pages of documents showing potential fraud and a thirty-two page analysis of student files.

From June 1998 to February 1999, the Georgia Department of Audits conducted an independent annual audit of FVSU that revealed serious noncompliance with federal regulations and risk factors for fraud. The auditors

5

formed no opinion on whether the noncompliance was intentional. Subsequent audits also revealed similar problems. Huff transferred out of the OFA in July 1999 and resigned in May 2000. In April 2002, FVSU reached a $2,167,941 settlement with the DOE to settle questioned costs identified by the state auditors in audits from 1997-2000 and in lieu of further file review.

In June 2004, Plaintiff filed suit in the district court, alleging (1) she was discharged in violation of the First Amendment for reporting her concerns about fraud, and (2) Huff, Sellers, and Prater knowingly submitted false or fraudulent claims to the United States in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq.[3] The district court concluded that Defendants were entitled to qualified immunity on Plaintiff's First Amendment claim because the motivation for Plaintiff's speech was unclear and preexisting case law did not give Defendants fair warning that Plaintiff's speech must be treated as "a matter of public concern" under the circumstances. The district court also concluded that Plaintiff's FCA claims were barred by 31 U.S.C. § 3730(e)(4)(A) because they relied on publicly disclosed information for which Plaintiff was not an "original

---

[3]Plaintiff also alleged wrongful termination in violation of the FCA, substantive and procedural due process violations, and state law claims for wrongful termination and intentional infliction of emotional distress. Plaintiff voluntarily dismissed the state law claims. The district court dismissed the remaining claims in a September 2001 order that Plaintiff did not appeal.

source." The district court granted summary judgment on both claims. Plaintiff originally appealed the grant of summary judgment against Huff, Prater, and Sellers but later dismissed the appeal of claims against Sellers.

## II. Discussion

We review a district court order granting summary judgment de novo, viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party. Cofield v. Goldkist, Inc., 267 F.3d 1264, 1267 (11th Cir. 2001). Summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### A. First Amendment Retaliation Claim

For a public employee to sustain a claim of retaliation for protected speech under the First Amendment, the employee must show by a preponderance of the evidence these things:

(1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee. Once the employee succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that "it would have reached the same decision . . . even in the absence of the protected conduct."

Anderson v. Burke County, Ga., 239 F.3d 1216, 1219 (11th Cir. 2001) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 97 S.Ct. 568, 576 (1977)). The first two elements are questions of law designed to determine whether the First Amendment protects the employee's speech. The third element and affirmative defense are questions of fact designed to determine whether the adverse employment action was in retaliation for the protected speech. Id.

In determining whether a public employee's speech is entitled to constitutional protection, we must first ask "whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006) (citations omitted); see also Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993) ("[W]e consider whether the speech at issue was made primarily in the employee's role as citizen,

8

or primarily in the role of employee." (citations and internal quotations omitted)).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 126 S. Ct. at 1960.

In Garcetti, the Supreme Court concluded that a deputy district attorney's speech was not protected by the First Amendment where the attorney testified in court and wrote in a disposition memorandum that he believed the affidavit used to obtain a critical search warrant in a criminal case contained serious misrepresentations. The "controlling factor" in the Court's decision was that the deputy's "expressions were made pursuant to his duties as a calendar deputy." Id. at 1959-60.

> When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny.

Id. at 1961. The Court rejected the idea that the nature of public employment transforms a public employee's statements into a matter of public concern protected by the First Amendment:

Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. . . .

. . . .

. . . . Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper, or discussing politics with a co-worker . When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.

Id. at 1960-61 (citations omitted). Although the Court acknowledged that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance," the Court concluded the public interest was protected by other means, including a "powerful network of legislative enactments -- such as whistle-blower protection laws and labor codes" -- not by permitting First Amendment retaliation claims based on "expressions employees make pursuant to their professional duties." Id. at 1962.

In this case, Plaintiff admitted that she had a clear employment duty to ensure the accuracy and completeness of student files as well as to report any

10

mismanagement or fraud she encountered in the student financial aid files.[4]   In

addition, DOE Guidelines require all financial aid workers to report suspected fraud.[5]

Plaintiff alleges her contract was not renewed because of her "continuous efforts to

expose the fraud within FVSU's Financial Aid Department." These efforts consisted

of attempts to disclose to both Prater and Sellers that her supervisor, Huff, was

making improper financial aid awards and falsifying information in student files. By

Plaintiff's own admission and in the light of federal guidelines, Plaintiff's speech to

FVSU officials about inaccuracies and signs of fraud in student files was made

---

[4]Plaintiff's deposition transcript contains the following exchange between Plaintiff and Defendant Huff's counsel:

Q:   Was it part of your responsibility in taking over the handling of these files to check the files or audit the files to see whether there was any mismanagement or fraud in the files?

A:   It was part of my responsibility to make sure it was complete and accurate.

Q:   If a file had fraudulent activity in it or what you perceived to be fraudulent activity, was it part of your responsibility to report that?

A:   Yes.

[5]In 1999, the National Association of Student Financial Aid Administrators issued a Peer Review Report to FVSU covering its financial aid activities for 1997-98. The report included a reminder to all financial aid workers of the following guideline from the DOE's 1997-98 Verification Guide:

If you suspect an applicant, employee, or other individual has misreported information and/or altered documentation to increase his or her student aid eligibility or to fraudulently obtain federal funds, you should report your suspicions (and provide any evidence) to the Office of Inspector General (OIG) or to local law enforcement officials.

11

pursuant to her official employment responsibilities.[6]  We conclude that because the

First Amendment protects speech on matters of public concern made by a government

employee speaking as a citizen, not as an employee fulfilling official responsibilities,

Plaintiff's retaliation claim must fail.  See Garcetti, 126 S. Ct. at 1961.[7]


    B.     FCA Claims

The district court dismissed Plaintiff's Federal Claims Act claim based on

the following jurisdictional bar:

> No court shall have jurisdiction over [an FCA qui tam action] based
> upon the public disclosure of allegations or transactions in a criminal,
> civil, or administrative hearing, in a congressional, administrative, or
> Government Accounting Office report, hearing, audit, or investigation,
> or from the news media, unless . . . the person bringing the action is an
> original source of the information.

---

[6]In Plaintiff's supplemental brief addressing Garcetti, she attempts to limit the scope of her admission by claiming her only employment duties related to her control and oversight of financial aid information provided by certain students, and not to the discovery of fraud by her supervisor, Huff. Plaintiff further argues that she had no official auditing duty to discover fraud because the State of Georgia performed an annual audit of the financial aid files. Regardless of whether Plaintiff had a duty to look for fraud, these assertions do not alter the uncontroverted fact that once Plaintiff did discover mismanagement or fraud within any of the student files, she had a clear duty to report this information. The issue in Garcetti was whether a public employee was speaking pursuant to an official duty, not whether that duty was part of the employee's everyday job functions.

[7]Because we conclude that Plaintiff has not been deprived of a First Amendment right, we do not reach the issue of qualified immunity.

31 U.S.C. § 3730(e)(4)(A). This Court uses a three-part inquiry to determine jurisdiction over an FCA claim based on publicly disclosed information: "(1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information." Cooper v. Blue Cross and Blue Shield of Florida, Inc., 19 F.3d 562, 565 n.4 (11th Cir. 1994). The FCA "is most naturally read to preclude suits based in *any part* on publically disclosed information." Id. at 567. Therefore, a plaintiff basing an FCA qui tam claim in any part on such publicly disclosed information must demonstrate that the plaintiff is an original source of that information. The FCA defines "original source" as "an individual who has direct and independent knowledge of the information *on which the allegations are based* and has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (emphasis added).

In the district court, Plaintiff "refer[red] Defendants to the audits performed by the State of Georgia Department of Audits and Accounts on June 30, 1998 and June 30, 1999" and indicated Plaintiff would "seek all damages allowed under the False Claims Act for these violations." Plaintiff's appellate brief states that "[i]n asserting damages in this case under the False Claims Act, plaintiff relies on the results of the state audits as well as 'accompanying notes already . . . produced by

13

plaintiff.'" Because Plaintiff's FCA claims rely chiefly on information that was publicly disclosed in the 1997-1998 and 1998-1999 state audits, the claims are barred unless Plaintiff qualifies as an original source.

We have commented that the FCA does not impose a strict tracing rule that would require the relator to trace the allegations from the disclosing agency back through the government bureaucracy to the relator. Cooper, 19 F.3d at 568 n.13. Nonetheless, the FCA mandates that, to qualify as an original source, a plaintiff must have direct and independent knowledge of the information on which the allegations are based. In other words, a plaintiff need not establish herself as *the* original source of the publicly disclosed information but must establish that she is *an* original source of the information in that she had direct and independent knowledge of the information on which she is basing her FCA claim.

Here, Plaintiff's allegations are based chiefly on the 1997-1998 and 1998-1999 state audits; and she failed to provide facts to the district court that might establish herself as an original source of the information contained in the state audits. Although Plaintiff need not trace the flow of information from herself to the DOE to the state audit reports, summary judgment was proper because Plaintiff failed to provide the district court with specific facts showing that she had direct and independent knowledge of the audit findings on which she bases her FCA

14

claims. None of the facts as evidenced by Plaintiff indicate that she participated in the state audits on which she relies or that she disclosed information to the auditors. More important, Plaintiff does not refer to her own research or documentation to prove that she had direct and independent knowledge of the findings contained in the state audits.[8]

We conclude Plaintiff is no original source as defined under the statute because she lacked direct and independent knowledge of the publicly disclosed information on which her claims are based: namely, the state audits. Therefore, the district court properly dismissed Plaintiff's FCA claims as jurisdictionally barred because Plaintiff's allegations substantially rely on information in the publicly disclosed state audit reports for which Plaintiff was no "original source."

Because they are unnecessary to our decision, we do not reach Defendants' alternative arguments that (1) Plaintiff could not qualify as an original source

---

[8]In this appeal, and for the first time, Plaintiff attempts to introduce evidence of a link between her own independent research of improprieties at FVSU and some of the findings of the state auditors on which she bases her claim. Plaintiff's appellate brief asserts that "there was commonality with 11 student files amounting to over $100,000 in misappropriated federal student aid." Because this argument is made for the first time on appeal, we do not consider it here. Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (citations and internal quotations omitted)); FDIC v. Verex Assurance, Inc., 3 F.3d 391, 395 (11th Cir. 1993) ("By well settled convention, appellate courts generally will not consider an issue or theory that was not raised in the district court."). "If we were to regularly address questions --particularly fact-bound issues -- that district[] court[s] never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court." Access Now, Inc., 385 F.3d at 1331.

because her job required her to report fraud, arguably making her disclosure involuntary; (2) the $2 million settlement between FVSU and the DOE was an "alternate remedy" under 31 U.S.C. § 3730(c)(5); (3) the settlement was a release or an accord and satisfaction of Plaintiff's qui tam claims; (4) Plaintiff presented insufficient evidence that Defendants knowingly submitted false claims; or (5) that Huff could not be held vicariously liable for acts of the employees she supervised.

AFFIRMED.