GREGORY A. PRESNELL, UNITED STATES DISTRICT JUDGE
This matter comes before the Court without a hearing on: (1) the Motion for Summary Judgment (Doc. 197) filed by Defendant Mitchell Sussman ("Sussman "); (2) the Response (Doc. 224) filed by the Plaintiffs, Orange Lake Country Club, Inc. ("Orange Lake ") and Wilson Resort Finance, L.L.C. ("Wilson Finance "); and (3) the Reply (Doc. 237) filed by Sussman.
I. Background[1]
A. Orange Lake and Wilson Finance
Orange Lake and Wilson Finance ("Plaintiffs ") are at the forefront of a legal battle that has emerged in the billion-dollar timeshare industry. Orange Lake develops, finances, manages, and sells timeshare resort properties, and Wilson Finance provides mortgage financing to purchasers of those properties. (Doc. 251, ¶¶ 2, 44, 45). Like many other providers of timeshares and timeshare financing, Plaintiffs have gone on the offensive against companies "whose business models profit from ... disrupting ... valid legal contracts between [timeshare] resorts and their owners." (Id. ¶ 1).
*1364 In the instant case, Plaintiffs claim that Defendants - Reed Hein & Associates d/b/a Timeshare Exit Team ("TET "), Thomas Parenteau ("Parenteau "), Brandon Reed ("Reed "), Trevor Hein ("Hein "), Schroeter Goldmark & Bender, P.S. ("SGB "), and Sussman - engaged in a scheme designed to induce timeshare owners, including owners of Orange Lake timeshares ("Orange Lake Owners " or "Owners "), to breach their timeshare agreements for Defendants' pecuniary gain. (Id. ¶ 46).
B. TET, Reed, Hein and Parenteau's Scheme
In 2012, Reed and Hein founded TET, which brands itself as a "consumer protection firm," dedicated to releasing timeshare owners from their contracts with timeshare developers. (Doc. 224-2, ¶ 3; Doc. 189-1; Doc. 189-2). Thereafter, Reed, Hein, and Parenteau (TET's Chief Operating Officer) began enticing timeshare owners to hire TET by making false promises to relieve them of their timeshare obligations. (Doc. 251, ¶¶ 49-51). To do this, Reed, Hein, and Parenteau spend one million dollars per month advertising through TET's website,[2] paid celebrity endorsements, and other marketing tools. (See, e.g. , Doc. 189-1; Doc. 189-2; Scott Loughran Dep., Doc. 189-3, p. 97).[3]
For example, on its website,[4] TET advertises that it will utilize its "proprietary process" to get rid of an owner's timeshare contract "Safely. Legitimately. Forever." (See Doc. 189-1; see also Doc. 189-2). As illustrated by the "Frequently Asked Questions" section of the website, TET targets timeshare owners who are:
• Not using their timeshare as much as they intended to
• Frustrated by unexpected "special assessments" and skyrocketing maintenance fees
• Financially set back by their timeshare maintenance fees and special assessments
• Frustrated by their failure to sell the timeshare through a listing company
• Concerned about their children inheriting their timeshare and then consequently becoming financially responsible for it
• Bothered they can't vacation where they want, when they want
• Tired of going to the same place every year
• Aggravated with exchange companies
• Realizing that there are more ways to go on vacation for much less
• Widowed or divorced, or are no longer able to travel with their loved ones
• Inheritors of a timeshare they don't want or use
• Part of resort scams
(Doc. 189-1, p. 1). Through these Frequently Asked Questions, TET "falsely portray [that] timeshare owners do not need any legal[ ] ... basis to terminate [their] timeshare contract[s]." (Doc. 251, ¶ 53).
"This marketing strategy generates in-bound calls through which prospective [clients] contact TET regarding its advertised services." (Tanya Freeman Decl., *1365 Doc. 224-2, ¶ 3). The in-bound leads are handled by TET-trained representatives, who gather background information from prospective clients and schedule in-person meetings.[5] (Id. ¶ 4). During those meetings, TET representatives advise prospective clients "that TET has a 'proprietary process' through which it can negotiate the termination of timeshare contracts in just three to nine months." (Id. ¶ 5). "This promise is backed by a supposed 100% money-back guarantee." (Id. ).
At the direction of TET, the representatives also instruct prospective clients to cease all communication with their timeshare developers and to stop making payments under their timeshare agreements. (Id. ¶ 6; see, e.g. , Doc. 224-6). Nonpayment is a key component of TET's sales pitch, as it allows TET's representatives to close the sale and collect an upfront fee for TET. (Doc. 224-2, ¶ 6). It is also used as "leverage" when TET attempts to "exit" timeshare owners from their timeshare agreements. (Id. ). "This 'leverage' is crucial as TET does not have a 'proprietary process' and does not conduct an actual investigation into whether a particular timeshare owner has any valid basis to breach his/her timeshare obligations." (Id. ¶¶ 6, 8). In fact, no attorneys participate in TET's client-intake process. (Id. ¶ 9).
TET charges an upfront fee for its services. (Id. ¶ 7). This upfront fee is not based on any specific analysis of the prospective client's timeshare contract or the amount of work that is required for TET to deliver on its promise. (Id. ). Rather, TET deliberately offers a fee that falls below the cost of the prospective client's contractual obligations to his or her timeshare developer. (Id. ).
After a prospective client executes TET's retainer documents, he or she is reminded "to make no further payments to their respective timeshare developer and to cease all communication with the developer." (Id. ¶ 11; Doc. 224-6; Doc. 189-22). Thereafter, TET transfers the client's file to a "vendor attorney"-such as SGB and Sussman-to execute TET's advertised "proprietary process" of getting rid of an owner's timeshare contract. (Doc. 224-2, ¶ 14; Doc. 189-4, pp. 22-23).
C. Sussman's Participation in the Scheme
TET hired Sussman as a vendor attorney on December 12, 2013. (Doc. 197-3, ¶ 4). Pursuant to their client retainer agreement, TET pays Sussman a fixed fee (in most cases, $ 500 per file) in exchange for "proprietary information[ ] regarding the liquidation and return of timeshares" belonging to TET's clients. (Doc. 224-4; Doc. 197-3, ¶¶ 5, 15; Doc. 224-7, p. 34). Sussman is expressly aware that TET's clients, including Orange Lake Owners, have entered into contracts with timeshare developers (Doc. 224-7, p. 125), but he never asks for their timeshare agreements or investigates any of the clients' cases prior to rendering services. (Id. at 36, 98). In fact, Sussman does not communicate with any of TET's clients. (Id. at 36, 60-61, 181).
Sussman assigns TET's client files to "associates," who work for him as independent contractors. (Id. at 50-51). His associates are responsible for sending boilerplate letters to the developers for all of TET's clients, including Orange Lake Owners. (Id. at 50-51; see, e.g. , Doc. 224-9). In the letters for TET's clients, Sussman: (1) accuses the developer of misrepresentation *1366 and fraud, regardless of the circumstances underlying the client's case (Doc. 224-7, pp. 54-55, 212-213); (2) instructs the developer not to communicate with the client (id. at 196); and (3) informs the developer that the client will not be paying any financial obligations associated with their timeshare ownership and that the developer can take the timeshare back (id. at 203-04).
Sussman has never filed a lawsuit for any of TET's clients, including Orange Lake Owners. (Id. at 95, 272). Instead, with TET's knowledge and approval, Sussman employs three methods to "exit" Orange Lake Owners from their timeshare contracts-(1) the "resignation" method, (2) the "deed back to [Plaintiffs]" method, or (3) the "deed to associate" method. (Id. at 90-91, 96).
1. Resignation method
For the first method, Sussman sends notices to Plaintiffs, informing them that the Orange Lake Owner is resigning from his or her timeshare. (Id. at 75-77). Sussman is aware that Plaintiffs do not accept resignations as valid cancellations of an Owner's timeshare contract. (See id. at 104 (acknowledging that "[Plaintiffs] do not accept anything"); see also id. at 272). Nevertheless, Sussman claims that his notice of an Owner's resignation constitutes a "valid exit" and that it is incumbent upon Plaintiffs to "to take whatever legal action they wish to take to invalidate what [he] feel[s] is a valid resignation." (Id. at 75-76). Sussman admits that Orange Lake Owners are required to comply with the terms of their timeshare contract if they have not paid in full at the time of the resignation. (Id. at 76-77). But Sussman never informs the Owners, thereby leaving them at risk of suit by Plaintiffs. (Id. at 76).
2. Deed back to Plaintiffs method
Sussman also uses the "deed back to Plaintiffs" method. (Id. at 93). Under this method, Sussman conveys the Owner's timeshare interest back to Plaintiffs via unilateral deed. (Id. at 93, 101). To accomplish this, Sussman pays various attorneys to prepare deeds designating Plaintiffs as the grantees. (Doc. 224-7, pp. 240, 254-55, 257, 258-59, 294; see Andre Young Decl., Doc. 224-10). The Owner signs the deed and then Sussman has the deed recorded. (See, e.g. , Doc. 224-14, pp. 7-8). Each deed recites that Plaintiffs (the grantees) paid Owner (the grantor) ten dollars in consideration for the timeshare. (See, e.g., id. at 7). But, in actuality, no consideration changes hands. (Doc. 224-7, pp. 286-87).
Sussman is aware that Plaintiffs do not accept unilateral deeds and that his deeds have resulted in "hundreds" of foreclosure actions, but Sussman never makes Orange Lake Owners aware of these facts. (Id. at 104-105; Doc. 224-10, ¶¶ 7-8). Instead, Sussman deems the transfer "valid" and issues a congratulatory letter informing the Owner that he or she is no longer contractually obligated to pay Plaintiffs. (See, e.g. , Doc. 224-14, p. 6; Doc. 224-7, pp. 282-85). Unless the Owner specifically requests that Plaintiffs be informed of the recorded deed, Sussman does not do so. (Doc. 224-7, pp. 272-73).
3. Deed to associate method
Sussman sometimes utilizes the "deed to associate" method. (Id. at 93-94). For this method, Sussman will have the Owner convey his or her timeshare interest to one of his associates. (Id. ). Each deed states that the associate (grantee) paid the Owner (grantor) consideration in the amount of ten dollars (or some other amount). (See, e.g. , Doc. 224-14, p. 7). But this consideration is never exchanged. (Doc. 224-7, pp. 133-134). Sussman simply pays the associate $ 100 to accept the deed. (Id. at 110, 112).
Sussman admits that he does "nothing" to ensure that his associates have the ability and intent to pay the financial obligations associated with the timeshare interest.
*1367 (Id. at 110-12, 134-35, 300). Once the transaction is effectuated, Sussman receives billing statements from Plaintiffs, but he does not forward those statements to his associates-the alleged new owners of the timeshares. (Id. at 239-40). According to Sussman, the statements are "trash." (Id. ).
Prior to employing the "deed to associate" method, Sussman fails to give Plaintiffs an opportunity to exercise their right of first refusal as provided in the Owners' timeshare contracts. (Id. at 135-136). Furthermore, after Sussman "transfers" a timeshare to one of his associates, he does not provide Plaintiffs with any notice. (Id. at 366-367). Despite Plaintiffs' lack of notice, Sussman claims that his "deed to associate" method is "absolutely" effective if Plaintiffs never challenge it. (Id. at 146). He also claims that his deeds absolve timeshare Owners of liability, not because of any legal process, but rather because anti-deficiency statutes may limit any remedy. (Id. 122-24). Sussman is aware that Plaintiffs do not consider these deeds as legitimate transfers of an Owner's timeshare interest, but Sussman never informs the Owners. (Id. at 140-41).
D. Damage to Plaintiffs
Through this purported scheme, Sussman and TET have advised thousands of clients that they were exited from their timeshare agreements when in fact they were not. (Doc. 224-2, p. 5, n.4; see, e.g. , Doc. 224-14, pp. 7-8). Rather than informing the clients affected by the inaccurate information, TET and Sussman "elected to not tell the [clients] the truth." (Doc. 224-2, p. 5, n.4). Instead, they "instructed the account coordinators to conceal the information" and profited to the tune of millions of dollars. (See id. ; see also Doc. 224-7, pp. 32-34 (Sussman's testimony that he received approximately 7,800 referrals from TET and was paid at least $ 500 per file, which amounts to approximately $ 3.9 million in revenue for Sussman alone) ).
Plaintiffs filed suit against Defendants on August 24, 2017, seeking monetary and injunctive relief. (Doc. 1). On December 5, 2018, Plaintiffs filed their Third Amended Complaint (Doc. 251) asserting claims for tortious interference with existing contracts (Count I), civil conspiracy (Counts III & IV), violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. (Count V), and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count VII).
Germane to the instant Order is Count III, wherein Plaintiffs allege that TET and Sussman conspired to interfere with the timeshare agreements between Plaintiffs and Orange Lake Owners. (Id. ¶¶ 102-110). On October 4, 2018, Sussman filed a motion claiming that he is entitled to summary judgment on several grounds, including lack of evidence. (Docs. 197, 237). Plaintiffs oppose Sussman's motion. (Doc. 224). Therefore, this matter is ripe for adjudication.
II. Legal Standards
Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As to issues for which the movant would bear the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case. Fitzpatrick v. City of Atlanta , 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *1368 United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys , 941 F.2d 1428, 1438 (11th Cir. 1991) ). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." Porter v. Ray , 461 F.3d 1315, 1320 (11th Cir. 2006) (citing Fitzpatrick , 2 F.3d at 1115-17 ).
"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Four Parcels , 941 F.2d at 1437 (quoting Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, Battle v. Bd. of Regents , 468 F.3d 755, 759 (11th Cir. 2006), such that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," Evans v. Stephens , 407 F.3d 1272, 1278 (11th Cir. 2005). However, the non-moving party must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp. , 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").
III. Analysis
Sussman claims that he is entitled to summary judgment as to Plaintiffs' claim for conspiracy because: (1) Plaintiffs fail to proffer sufficient evidence to satisfy essential elements of their claim; (2) he was the agent for Orange Lake Owners and, therefore, privileged to interfere with their timeshare contract; (3) his act of sending letters to Plaintiffs is immunized under the Noerr - Pennington doctrine; (4) his act of sending letters to Plaintiffs is immunized under Florida's litigation immunity privilege; and (5) he is legally incapable of conspiring with TET pursuant to the intra-corporate conspiracy doctrine. (Doc. 197, pp. 5-13). The Court addresses each of these arguments in turn.
E. Evidence of a Conspiracy
To prevail on a claim for conspiracy, a plaintiff must prove: (1) an agreement between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in furtherance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy. Charles v. Florida Foreclosure Placement Center, LLC , 988 So.2d 1157, 1159-60 (Fla. 3d DCA 2008).
In his motion, Sussman attacks only the first two elements of Plaintiffs' conspiracy claim. He argues that there is no proof of a conspiracy because his "client attorney agreement" with TET "is neither unlawful[,] nor does it require [him] to perform a lawful act by unlawful means." (Doc. 197, p. 5). However, "[c]onspiracies are rarely evidenced by explicit agreements[ ] and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." See DeLong Equip. Co. v. Washington Mills Abrasive Co. , 887 F.2d 1499, 1515 (11th Cir. 1989). Therefore, the Court must look beyond a defendant's bald denial of concerted action and look to the evidence to determine whether summary judgment is appropriate. Id.
According to the evidence submitted by Plaintiffs, TET lured timeshare owners, including Orange Lake Owners, into retaining its services by making false promises to relieve owners of their timeshare obligations. Specifically, TET advertised that it would utilize its "proprietary process" to get rid of an owners' timeshare contracts "[s]afely" and "[l]egitimately". (Doc. 189-1; Doc. 189-2; Doc. 224-2, ¶¶ 3-11). As a result, Orange Lake Owners executed retainer agreements with TET, *1369 and at TET's direction, stopped making payments under their timeshare agreements with Plaintiffs. (See generally , Doc. 224-6). But TET had no proprietary process. (Doc. 224-2, ¶¶ 6, 17). TET simply transferred the Owners' files to contract attorneys, like Sussman, who received at least $ 500 per file. (Id. ¶¶ 14-16; Doc. 197-3, ¶¶ 4-5; Doc. 224-7, ¶ 34).
Sussman did not communicate with the Owners or investigate the specific circumstances underlying their cases. (Doc. 224-7, pp. 36, 60-61, 98, 181). Instead, Sussman sent formulaic letters to the Plaintiffs informing them that the Owners would no longer be making contractually obligated timeshare payments and that Plaintiffs could "take back their timeshare[s]." (Doc. 224-7, p. 98, 203-204). With the knowledge and approval of TET, Sussman then employed three "exit" strategies that he knew Plaintiffs did not accept as valid cancellations of a timeshare contract. (Doc. 224-7, pp. 104, 272; Doc. 224-10, ¶ 8).
Sussman and TET also represented to Orange Lake Owners that they were released from their contractual obligations to Plaintiffs when in fact they were not. (See, e.g. , Doc. 224-14, pp. 6-8; Doc. 224-2, p. 5 n.4). As a result, Plaintiffs have initiated foreclosure actions against hundreds of Owners, thereby subjecting the Owners to negative credit reporting implications. (See, e.g. , Doc. 224-14, p. 9; Doc. 224-7, 105-06; Doc. 224-2, ¶¶ 20, 24). Based on these facts a jury could reasonably find that TET and Sussman conspired to interfere with the timeshare agreements between Plaintiffs and Orange Lake Owners. Accordingly, the Court will not grant Sussman's motion on this ground.
F. Privilege to Interfere
An action for civil conspiracy only exists if "the basis for the conspiracy is an independent wrong or tort which would constitute a cause of action if the wrong were done by one person." Blatt v. Green, Rose, Kahn & Piotrkowski , 456 So.2d 949, 951 (Fla. 3d DCA 1984). As noted above, Plaintiffs allege that TET and Sussman conspired to interfere with the timeshare agreements between Plaintiffs and Orange Lake Owners (Count III). (See Doc. 251, ¶¶ 102-109). Therefore, Plaintiffs' claim for conspiracy is grounded in its claim for tortious interference with existing contracts (Count I). (Doc. 251, ¶¶ 89-101, 102-109).
Florida courts generally hold that an agent cannot be held liable for tortiously interfering with the contract of his principal because the agent is privileged to act in the principal's best interest. See Sloan v. Sax , 505 So.2d 526, 528 (Fla. 3d DCA 1987). Relying on this principle, Sussman argues that Plaintiffs' claim for tortious interference (and therefore their claim for conspiracy) fails because, as the agent for Orange Lake Owners, he was privileged to interfere with their timeshare contracts. (Doc. 197, pp. 6-8). The Court disagrees.
An agency relationship exists in Florida when the principal acknowledges that the agent will act for him, when the agent accepts the undertaking on the principal's behalf, and when the principal controls the actions of the agent. See, e.g., Goldschmidt v. Holman , 571 So.2d 422, 424 n.5 (Fla. 1990) ; Font v. Stanley Steemer Int'l , 849 So.2d 1214, 1216 (Fla. 5th DCA 2003).
The evidence, when construed in the light most favorable to Plaintiffs, reveals that Orange Lake Owners did not acknowledge that Sussman would act on their behalf. (See Doc. 224-2, ¶¶ 12, 15, 16). Nor did they instruct, advise, or control the means by which Sussman attempted to "exit" them from their timeshare contracts. (See generally Doc. 224-6 (affidavits from Owners who affirm that they were *1370 not aware that Sussman was working on their cases) ).
Sussman was acting as an agent for, and at the direction of, TET. (See Doc. 197-3, ¶¶ 4, 5, 18; see also Doc. 197, p. 7 (admitting that "Sussman was acting ... at the direction of his client TET") (emphasis added). Sussman admits that he never consulted with, met with, or otherwise communicated with any of TET's clients, including Orange Lake Owners. (Doc. 224-7, pp. 36, 60-61, 181). In fact, if one of TET's clients called him to inquire about their case, Sussman would "let them know that they needed to discuss the matter directly with [TET]" because he was "not being paid for customer service." (Id. at 36 (emphasis added) ).
On these facts, the Court cannot reasonably conclude that an agency relationship existed between Sussman and Orange Lake Owners. Even if Sussman had an agency relationship with Orange Lake Owners, his "privilege to interfere" with their contracts was not absolute. See Sloan v. Sax , 505 So.2d 526, 528 (Fla. 3d DCA 1987). "[T]he privilege afforded [to] an agent ... is not available where the agent acts solely with ulterior purposes and the advice is not in the principal's best interest," Scussel v. Balter , 386 So.2d 1227, 1228-29 (Fla. 3d DCA 1980), or where "improper methods" are employed, KMS Rest. Corp. v. Wendy's Int'l, Inc. , 361 F.3d 1321, 1327 (11th Cir. 2004).
Sussman did not investigate any Owners' situation to determine if they could safely and lawfully exit their timeshare agreements with Plaintiffs. (Doc. 224-7, pp. 36, 98). He merely sent form letters to Plaintiffs and then employed one of his three "exit" strategies. (Doc. 224-7, at 96, 98, 50-51). Despite knowing that Plaintiffs do not accept any of his "exit" strategies, Sussman falsely informed Orange Lake Owners that they were successfully "exited" from their timeshare agreements. (Id. at 104, 272; Doc. 224-10, ¶ 8; Doc. 224-14, p. 6; Doc. 224-2, p. 5 n.4). As a result, Plaintiffs filed foreclosure actions against hundreds of Orange Lake Owners, subjecting them to negative credit reporting consequences. (See, e.g. , Doc. 224-14, p. 9; see also Doc. 224-7, pp. 105-06; Doc. 224-2, ¶¶ 20, 24).
These facts represent sufficient circumstantial evidence from which a reasonable jury could infer that Sussman acted, not in the best interest of Orange Lake Owners, but solely with ulterior motives. As such, Sussman was not privileged to interfere with the timeshare contracts between Plaintiffs and Orange Lake Owners.
G. Noerr-Pennington Doctrine
The Noerr - Pennington doctrine originates from two Supreme Court cases: E. R. R. Presidents Conference v. Noerr Motor Freight, Inc. , 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and United Mine Workers of America v. Pennington , 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Though springing in part from the language of the Sherman Act, the doctrine "rests in large part on the general First Amendment guarantees of freedom to petition and freedom of association." McGuire Oil Co. v. Mapco, Inc. , 958 F.2d 1552, 1562 (11th Cir. 1992). "The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." Video Int'l. Production, Inc. v. Warner-Amex Cable Communications, Inc. , 858 F.2d 1075, 1082 (5th Cir. 1988).
Although the Noerr doctrine initially arose in the antitrust context, See Noerr Motor Freight, Inc. , 365 U.S. at 136-38, 81 S.Ct. 523, courts have extended the Noerr doctrine to protect First Amendment "petitioning of the government *1371 from claims brought under federal and state laws including ... common-law tortious interference with contractual relations," Video Int'l Prod., Inc. , 858 F.2d 1075, 1084 (5th Cir. 1988) ; (see Doc. 27, p. 5) (collecting cases). Such "petitioning immunity" extends to "those acts reasonably and normally attendant [to] effective litigation," such as pre-suit demands and cease-and-desist letters that threaten litigation. Coastal States Marketing, Inc. v. Hunt , 694 F.2d 1358 (5th Cir. 1983) ; McGuire Oil Co. , 958 F.2d at 1560 ; Sosa v. DIRECTV, Inc. , 437 F.3d 923, 934 (9th Cir. 2006) (noting that the Noerr doctrine protects "conduct incidental to the prosecution of the suit").
There is an exception to Noerr immunity, however, for "sham" petitioning activities seemingly undertaken to induce government action, but actually done for the purpose of interfering directly with the business of another. McGuire Oil Co. , 958 F.2d at 1559 ; City of Columbia v. Omni Outdoor Adver., Inc. , 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). As with immunity generally, the burden is on the party seeking to impose liability to show that the sham exception applies. McGuire Oil Co. , 958 F.2d at 1558 n. 9, 1560.
First, the liability-seeking party must show that the litigation activity was "objectively baseless, in the sense that no reasonable litigant could realistically expect success on the merits." Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc. (PRE) , 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). If the "objectively baseless" standard is met, the liability-seeking party must then show that the petitioning party had the subjective intent to inhibit competition, rather than to seek government redress. Id . at 60-61, 113 S.Ct. 1920 (citations omitted).
Sussman posits that by sending the letters to Plaintiffs, he engaged in prelitigation conduct for which he is immune from liability under the Noerr doctrine. (Doc. 37 at 2-3). As support for his position, Sussman largely relies on Silverhorse Racing, LLC v. Ford Motor Co. , 232 F.Supp.3d 1206 (M.D. Fla. 2017), in which the court held a defendant's act of sending letters threatening to sue to enforce its exclusivity contracts fell within the scope of Noerr immunity. (Doc. 197, p. 9). He also relies on Marco Island Cable, Inc. v. Comcast Cablevision of S., Inc. , No. 2:04-cv-26-FTM-29DNF, 2006 WL 1814333, at *1 (M.D. Fla. July 3, 2006), in which the court found that the defendant's act of sending cease and desist letters to distributors, demanding that they stop selling unlicensed and infringing products, was immunized from civil liability pursuant to the Noerr - Pennington doctrine. ( Id. ).
Sussman's letters differ significantly from the letters in Silverhorse and Marco Island . Unlike the letters in those cases, Sussman's letters do not demand that Plaintiffs stop committing an illegal act. Nor do those letters assert any legal claims against Plaintiffs or threaten to sue. Furthermore, Sussman has never filed and (according to his client retainer agreement with TET) would not "file legal action [against Plaintiffs] in either state or federal court". (Doc. 224-4, p. 2; Doc. 224-7, pp. 95, 272). Accordingly, Sussman has not engaged in the type of prelitigation activity that is shielded from liability under the Noerr doctrine.
Even assuming Sussman had engaged in prelitigation activity by sending the letters, the Court still could not conclude that he is immune from liability for two reasons: For starters, Plaintiffs' conspiracy claim is not premised solely on the letters he sent to the Plaintiffs, but also on the methods he used to "exit" Orange Lake Owners from their timeshare contracts. And genuine issues of fact remain as to *1372 whether Sussman's letters fall within the sham exception of the Noerr doctrine. As Plaintiffs note, a jury could reasonably conclude that Sussman's letters were objectively baseless and not reasonably calculated to elicit a favorable outcome because (1) Sussman sent boilerplate letters to Plaintiffs without ever communicating with Orange Lake Owners to determine they could legitimately and lawfully "exit" their timeshare agreements; (2) Sussman never investigated the circumstances underlying an Owner's case; and (3) he employed one of three "exit" methods that he knew were expressly rejected by Plaintiffs.
Likewise, a jury could find that Sussman had the subjective intent to interfere with the timeshare contracts between Plaintiffs and Orange Lake Owners - rather than to petition the government for redress - because he never threatened or initiated litigation against Plaintiffs and his client retainer agreement with TET expressly states that litigation was completely outside the scope of his services. Accordingly, the Court cannot conclude, as a matter of law, that Sussman is entitled to immunity under the Noerr doctrine.
H. Florida's Litigation Privilege
Florida's litigation privilege affords absolute immunity for acts or statements during the course of judicial proceedings if they have some relation to the proceeding. Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co. , 639 So.2d 606, 607-608 (Fla. 1994). The litigation privilege "extends to the protection of the judge, parties, counsel, and witnesses, and arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceeding or as necessarily preliminary thereto." Ange v. State , 98 Fla. 538, 123 So. 916, 917 (Fla. 1929). Statements "necessarily preliminary" to judicial proceedings include pre-suit communications required by statute or by contract as a condition precedent to suit, See Pledger v. Burnup & Sims, Inc. , 432 So.2d 1323, 1326 (Fla. 4th DCA 1983).
Sussman contends that he is entitled to immunity because his letters were protected pre-suit communications. However, Sussman's has supplied no evidence showing that his letters were required by statute or by contract as a condition precedent to suit. Nor has he provided evidence showing that his letters were related to the prosecution or defense of a suit. As noted above, Sussman has never filed, and according to his agreement with TET, he would not file suit against Plaintiffs. Therefore, the Court does not find that Sussman's letters fall within the ambit of Florida's litigation privilege. See Trent v. Mortg. Elec. Registration Sys., Inc. , 618 F.Supp.2d 1356, 1360 (M.D. Fla. 2007) (declining to extend the litigation privilege to "pre-suit communications" where such communications were not required by law).
I. Intra-corporate Conspiracy Doctrine
Sussman also contends that Plaintiffs' claim for conspiracy fails because he is an attorney/agent for TET, and pursuant to the intra-corporate conspiracy doctrine, an agent cannot conspire with his corporate principal or employer. (Doc. 197, p. 14). However, Florida courts recognize the "personal stake" exception to the intra-corporate conspiracy doctrine. Richard Bertram, Inc. v. Sterling Bank & Tr. , 820 So.2d 963, 966 (Fla. 4th DCA 2002). Under this exception, where an agent has a "personal stake in the activities separate from the principal's interest," the agent can be liable for civil conspiracy. Id.
To prove such a personal stake, an agent must have "a personal stake in the activities that are separate and distinct from the corporation's interest."
*1373 Lipsig v. Ramlawi , 760 So.2d 170, 181 (Fla. 3rd DCA 2000). In other words, the agent must have "acted in their personal interests, wholly and separately from the corporation." Microsoft Corp. v. Big Boy Distr. LLC , 589 F.Supp.2d 1308, 1323 (S.D. Fla. 2008) (citation omitted).
In the present case, Plaintiffs have proffered evidence showing that TET profited from the alleged conspiracy by, inter alia , collecting upfront fees from timeshare owners, including Orange Lake Owners. (Doc. 224-2, ¶ 11; Doc. 224-6, pp. 4, 9, 14, 17). Sussman, on the other hand, profited by receiving $ 500 for every client file he received from TET. (Doc. 224-7, p. 34). Indeed, Sussman admits that he has received approximately 7,800 referrals from TET, which amounts to approximately $ 3.9 million in revenue. (Id. at 32-34). These facts are sufficient to allow a jury to conclude that Sussman had a personal stake in the conspiracy that was separate and distinct from TET. Accordingly, the Court does not find that Plaintiffs' claim is barred by the intra-corporate doctrine.
IV. Conclusion
In consideration of the foregoing, it is hereby
ORDERED that the Motion for Summary Judgment (Doc. 197) filed by Defendant Mitchell Reed Sussman is DENIED .
DONE and ORDERED in Orlando, Florida on January 4, 2019.

The following facts reflect the "best case" for Plaintiffs, which is what the Court must consider at the summary judgment stage. See Robinson v. Arrugueta , 415 F.3d 1252, 1257 (11th Cir. 2005) ; Evans v. Stephens , 407 F.3d 1272, 1278 (11th Cir. 2005).

The website can be found at http://www.timeshareexitteam.com, www.reedhein.com, and www.321exit.com.

When citing to a deposition, the Court will use the original pagination from the deposition instead of the page numbers designated by the CM/ECF system.

For purposes of this Order, references to TET also include Reed, Hein, and Parenteau.

Representatives are also permitted to hold meetings via videoconference6. (Doc. 224-2, ¶ 4).