[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10605
Non-Argument Calendar
_____

D.C. Docket No. 1:16-cv-24031-KMW


SARA HERRERA,

                                                    Plaintiff - Appellant,

versus

7R CHARTER LIMITED,

                                                    Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 22, 2019)

Before WILLIAM PRYOR, JILL PRYOR and GRANT, Circuit Judges.

PER CURIAM:

Sara Herrera appeals from the district court's grant of summary judgment in her lawsuit under the Jones Act, 46 U.S.C. § 30104, alleging that she was injured as a result of negligence by her employer, 7R Charter Limited. The district court granted 7R Charter's motion for summary judgment, finding that Herrera failed to present a genuine issue of fact as to whether she was acting within the course and scope of her employment when she was injured. After careful review, we conclude that the district court erred, and we vacate the grant of summary judgment.

## I.    BACKGROUND

### A. Factual History

Herrera suffered injuries to her spine and head when she was involved in an incident aboard a Protector brand marine vessel piloted by Bernard Calot. Herrera and Calot were both employed by 7R Charter, the owner of the M/Y Olga, a motor yacht that the company used in the business of chartering. Calot was the Olga's captain, and Herrera was its Chief Stewardess. They also were romantically involved at the time of the incident.[1]

As employees of 7R Charter, Herrera and Calot were required to be on call 24 hours a day, 7 days a week, 52 weeks per year, except when on vacation. They also were required to wear a uniform while on duty and when guests or the owner of 7R Charter, Luis Rubi, was present, but they sometimes wore their personal

---

[1] Herrera and Calot are now married.

2

clothing.  Calot's contract stated that no unauthorized persons were allowed on the vessel without approval from "the owners."  Doc. 65-2 at 49.[2]

As captain, Calot was responsible for repairs to the Olga, maintaining its equipment, supervising the crew while on duty, and ensuring the safety and security of the vessel.  Rubi testified that he relied on Calot to ensure that the Olga was always ready for charters and that "during the daily operations, it was Bernard Calot who called the shots."  Doc. 87-3 at 23.  The Olga's crew was small, so everyone "help[ed] in all departments, inside[] [and] outside."  Doc. 87-1 at 17. Herrera's responsibilities on board the Olga included maintaining the interior of the vessel, helping with docking, handling the lines on the yacht, and assisting in operations on the "tender."  The tender was a smaller vessel that the Olga carried during charters to transport passengers from the yacht to beaches or to diving or fishing expeditions.

For many years, 7R Charter owned the vessel that it used as the Olga's tender, but the company eventually began renting vessels from Calot to use as the tender.  Rubi and Calot reached a verbal agreement requiring Calot to have a tender ready at all times in the event of a charter on the Olga.  Rubi and Calot agreed that Calot's boat would be used if it was available; otherwise, Calot would

---

[2] Citations in the form "Doc. #" refer to numbered entries on the district court's docket.

have to rent another vessel.  7R Charter would pay Calot $400 for each day that his tender was used on a charter.

7R Charter initially rented a Fontaine brand vessel from Calot but soon began using instead the Protector brand vessel Calot purchased in 2015. According to Calot, he purchased the Protector "to use it for the business of the chartering."  Doc. 87-1 at 31.  He also said that the Protector was a more attractive tender for guests on the Olga because it could be used for diving and fishing trips. Soon after its purchase, the Protector was added to the Olga's insurance policy as an "additional watercraft."[3]

Herrera and Calot testified that the incident resulting in Herrera's injuries occurred while they were conducting a "sea trial" of the Protector for 7R Charter. Before using the Protector as a tender for any charter, Calot paid to have repairs, maintenance, and upgrades performed on the new vessel.  Calot later had some additional repairs performed on the Protector's engines and picked the boat up from the mechanic the day before the incident.  He testified that he did not immediately perform a sea trial on the Protector because it was too late in the day, so it was more practical to navigate straight home.

---

[3] 7R Charter asserts that the Protector was removed from the Olga's insurance policy on January 27, 2015, months before Herrera's accident, and cites to an insurance document in support of that assertion.  A different insurance document cited by Herrera, however, shows that the Protector was *added* on that date, not removed.  For purposes of reviewing the district court's summary judgment determination, we credit Herrera's document over 7R Charter's. *See infra* Part II.

The following morning, the day of the incident, Herrera's daughter and two friends were visiting from Mexico. Herrera testified that, after having breakfast together, she, Calot, and their guests took the Protector out for the sea trial. The first mate of the Olga, Clemron Genroy, did not attend the sea trial because he was performing maintenance and repairs to the Olga. Calot and Herrera informed the guests before boarding the Protector that they would be conducting a sea trial. Rubi had not instructed Calot to conduct the sea trial, Calot had not asked for permission, and Calot had not asked for permission to have guests aboard the Protector.

Calot operated the Protector while Herrera sat beside him during the sea trial. They were not wearing their full Olga uniforms, but Herrera stated that she was wearing her uniform shorts. Herrera recounted that during the sea trial she sat, talked with their guests, and listened to music. The group eventually decided to get lunch at the Bayside Marina, and the incident occurred as they were arriving. While the Protector was in a "no wake" zone, Herrera stood at the front end of the vessel, handling the lines in preparation to dock. Another vessel passed in front of the Protector, creating a wake that threw Herrera into the air, dropped her on her back or buttocks, and knocked her unconscious. Calot never charged 7R Charter for the use of the Protector that day.

5

### B. Procedural History

Herrera filed the instant complaint pursuant to the Jones Act, 46 U.S.C. § 30104, alleging that her injuries were caused by Calot's negligence and 7R Charter was vicariously liable. 7R Charter answered and, following discovery, moved for summary judgment, arguing that Herrera could not establish Jones Act liability because there was no genuine issue as to the material fact that neither she nor Calot was acting within the course of employment when Herrera suffered her injuries. The district court agreed and granted the motion.

The district court first found that the undisputed fact that Herrera was on call at all times did not require the court to find that she was acting within the scope of her duties for 7R Charter. Next, the court found that Herrera was not furthering 7R Charter's business interests when she suffered her injuries because the company never ordered Calot to conduct repairs on the Protector and was unaware that he was conducting a sea trial on it. The court added that Herrera's duties as Chief Stewardess had nothing to do with securing a tender for the Olga or conducting a sea trial. Finally, the court found that the circumstances surrounding the outing on the Protector demonstrated that its purpose was for pleasure, taking Herrera and Calot outside the course and scope of their employment. The court concluded that even assuming that Calot set out to conduct a sea trial on the Protector, Herrera had

6

provided no explanation for how her or her guests' presence on the Protector furthered 7R Charter's interests.

This is Herrera's appeal.

## II.    STANDARD OF REVIEW

We review an order granting summary judgment *de novo*, viewing "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case.  An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).  A court may not disregard a party's evidence at the summary judgment stage merely because it is self-serving. *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1299 (11th Cir. 2015).  "Even if the district court believes that all the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of such credibility choices." *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995).

### III.    DISCUSSION

Herrera argues that the district court erred in granting summary judgment. She argues that she presented, and the district court improperly rejected, evidence that she and Calot were on board the Protector to conduct a sea trial when she was injured, and the sea trial was within the course of their employment. She notes that she and Calot were on call 24 hours per day, the Protector was a part of the Olga's operations, and Calot was authorized to manage the ship's crew and assign them work. She states that the sea trial was necessary and that Calot, as captain, ordered her to help him carry it out.

The Jones Act provides that "[a] seaman injured in the course of employment" may "bring a civil action at law . . . against the employer." 46 U.S.C. § 30104. If the employee's injury occurred when she was acting outside the course of her employment, the Jones Act does not afford relief. *See Daughdrill v. Diamond M. Drilling Co.*, 447 F.2d 781, 784 (5th Cir. 1971) ("[W]e hold that Daughdrill . . . was not [acting] within the course of his employment. . . . This ends the Jones Act claim.").[4] Similarly, where the plaintiff's injury was caused by another employee's negligence, the employer is liable under the Jones Act only if the negligent employee was acting within the course of his employment. *See*

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

*Moore v. Associated Pipeline Contractors*, 468 F.2d 815, 815 (5th Cir. 1972); *see also Beech v. Hercules Drilling Co., L.L.C.*, 691 F.3d 566, 572 (5th Cir. 2012) (stating that "to hold an employer vicariously liable under the Jones Act for one employee's injury caused by the negligence of a co-employee, a plaintiff must show that the injured employee and the employee who caused the harm were both acting in the course of their employment at the time of the accident").

We have never expressly set forth in a Jones Act case any standard for determining whether an employee's actions were within the course of her employment. The district court, in granting the government's motion for summary judgment, looked to the Fifth Circuit's decision in *Beech*, which held that "the test for whether a Jones Act employee was acting within the course and scope of his employment is whether his actions at the time of the injury were in furtherance of his employer's business interests." 691 F.3d at 574. Neither Herrera nor 7R Charter has challenged the district court's reliance on this standard.

We have held in a related context, however, that acts that are incidental to an employee's work can fall within the course of her employment, even if the employee is not performing her customary job duties. *Fowler v. Seaboard Coastline R.R. Co.*, 638 F.2d 17, 20 (5th Cir. Unit B Feb. 1981) (discussing the meaning of "within the scope of employment" to determine liability under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51); *see Skye v. Maersk*

*Line, Ltd. Corp.*, 751 F.3d 1262, 1255 (11th Cir. 2014) (noting that the Jones Act "incorporated the remedial scheme of the [FELA], and case law interpreting the latter statute also applies to the Jones Act"). We declared in *Fowler* that the proper test for determining scope of employment under FELA was "whether the act was one which the employer might reasonably have foreseen and which the employee might reasonably have thought necessary in the interest of or in the benefit of the employer." 638 F.2d at 20.

Whether we apply the standard set forth in *Beech* or the one from *Fowler*, the district court erred in granting summary judgment because there is a genuine issue of material fact as to whether Calot and Herrera were acting in the course of their employment for 7R Charter and therefore whether 7R Charter can be held liable under the Jones Act for Calot's alleged negligence. *See* Fed. R. Civ. P. 56(a); *Daughdrill*, 447 F.2d at 784; *Moore*, 468 F.2d at 815.

The district court determined, as a matter of law, that Calot and Herrera were operating the Protector for pleasure, rather than conducting a sea trial, but this was error. Both Herrera and Calot testified that they were conducting a sea trial of the Protector on the day she was injured. 7R Charter disputes this fact, and has presented some evidence to the contrary, but at this stage, we must credit Calot's and Herrera's testimony. *See Battle*, 468 F.3d at 759. This is so even if we believe their testimony to be self-serving and untrue because those credibility

10

determinations are for a finder of fact to decide.  *See Liebman*, 808 F.3d at 1299; *Harris*, 65 F.3d at 917.

Accepting, for purposes of summary judgment, that Calot and Herrera were conducting a sea trial, we conclude that a finder of fact reasonably could decide that the sea trial was in the course of their employment.  Under the *Beech* standard, conducting a sea trial of the Protector arguably was in furtherance of 7R Charter's business interests.  *See* 691 F.3d at 574.  Even if Calot personally benefited from the sea trial, 7R Charter also benefited.  The Olga needed a tender for its charters and, to that end, 7R Charter agreed with Cabot that he must have a tender ready at all times.  A sea trial following repairs ensured that the Protector would be available and that Calot would not have to seek out another tender if the Olga were hired for a charter.  Herrera supported the sea trial—and thereby benefited 7R Charter—because she had experience in tendering operations, docking, and handling lines.  Indeed, as Rubi acknowledged, Olga's small crew required that everyone—Herrera included—"help in all departments."  Doc. 87-1 at 17.

Similarly, summary judgment was inappropriate under the *Fowler* standard. That Calot and Herrera would conduct a sea trial of the Protector was reasonably foreseeable by 7R Charter, and the employees might reasonably have thought that the sea trial was necessary in the interest of or to the benefit of 7R Charter.  *See Fowler*, 638 F.2d at 20.  As captain, Calot maintained the Olga's equipment,

11

ensured the safety and security of the vessel, and "called the shots" on daily operations. Doc. 87-3 at 23. He also was required to ensure that the Olga was always ready for a charter and had agreed that he would provide the tender for the Olga's charters. Calot's decision to conduct a sea trial of the Protector would thus be well within the range of acts that were incidental to his employment.

Herrera's duties included helping with docking, handling lines, and tendering operations. She also was on call at all times that she was not on vacation. A reasonable factfinder could therefore find that Herrera's assistance in the sea trial of the tender—at her captain's direction and when the Olga's first mate was unavailable—was within the course of her employment because it was incidental to her duties. *See Fowler*, 638 F.2d at 20.

## IV.    CONCLUSION

Herrera has come forward with evidence that she and Calot were conducting a sea trial of the Protector at the time of her injury and that a sea trial was within the course of their employment. The district court therefore erred in granting summary judgment. We vacate the district court's judgment and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**