[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-14298

Non-Argument Calendar

_____

KYLE BOSARGE,

Plaintiff-Appellant,

versus

MOBILE AREA WATER & SEWER SERVICE,
SHARON KING,
FATIMA WASHINGTON,

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:18-cv-00240-TFM-N

———————————

Before JILL PRYOR, LUCK, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff appeals the district court's order granting summary judgment to Defendants on his employment discrimination and retaliation claims arising under the Americans with Disabilities Act ("ADA") and on his First Amendment retaliation claim. After a careful review of the record and briefs, we affirm in part and remand in part.

## BACKGROUND

Defendant Mobile Area Water and Sewer Service ("MAWSS") is a public entity that does business in Mobile County, Alabama. MAWSS hired Plaintiff Kyle Bosarge to fill an Auto Service Worker ("ASW") I position in June 2013 and promoted Plaintiff to an ASW II position in July 2014. MAWSS garage supervisor Charles Sumrall supervised Plaintiff in both ASW positions. Defendants Sharon King and Fatima Washington were, at all relevant times, MAWSS Human Resources ("HR") officers.

Plaintiff was diagnosed with multiple sclerosis ("MS") in 2000. In September 2015, Plaintiff requested Family and Medical

Leave Act ("FMLA") intermittent leave for occasional absences and tardiness related to his MS.  In support of Plaintiff's request, his treating physician, Dr. Terry Millette, submitted an FMLA form to MAWSS in October 2015 certifying that Plaintiff had a serious health condition (MS), which caused episodic flare-ups that periodically prevented Plaintiff from performing his job functions and required him to be absent from work.  Based on the information provided by Dr. Millette on the October 2015 form, MAWSS granted Plaintiff's request for intermittent FMLA leave.

In May 2016, MAWSS posted a job vacancy for a Vehicular/Equipment Mechanic position with the Mobile County Personnel Board.[1]  As described in the posting, the duties of the Mechanic position included, among other things:  inspecting, maintaining, and repairing MAWSS vehicles, test driving vehicles to ensure proper operation, operating a tow truck when necessary, and making repairs to vehicles in the field as necessary.  As minimum and special requirements of the position, the posting listed:  (1) completion of an apprenticeship or trade school program in automotive or diesel repair, (2) one year's journeyman level experience in maintenance and repair, (3) knowledge of a variety of engines, systems, repair methods, and standard mechanics practices, and (4) a commercial driver's license ("CDL") or a valid state driver's license and

---

[1] As a public entity operating in Mobile County, MAWSS is required to fill its job vacancies through postings with the Mobile County Personnel Board.

the ability to obtain a CDL with appropriate endorsements, including an air brake endorsement.

Plaintiff applied for the Mechanic position, which would have been a promotion from the ASW II position he held at the time. After reviewing his application, the Personnel Board determined that Plaintiff was not qualified for the promotion because he did not meet the minimum prior experience requirements listed in the Mechanic vacancy posting. The Mechanic vacancy initially closed without being filled, but it was reopened on June 16, 2016, to give Plaintiff an opportunity to update his application materials. Plaintiff submitted a revised application that included additional information about his prior work experience, and the Board certified him as qualified for the Mechanic position and referred him to MAWSS for possible promotion. Sumrall, Plaintiff's supervisor, recommended that Plaintiff receive the promotion.

While Plaintiff was applying for the Mechanic position, HR officer Washington learned about Plaintiff's MS diagnosis and the FMLA paperwork he had filed in October 2015.[2] Based on the information provided by Dr. Millette in the October 2015 FMLA form—which described Plaintiff's symptoms as including

---

[2] Because FMLA requests were handled by a different section of MAWSS's Human Resources department, Washington had been unaware of Plaintiff's October 2015 FMLA leave application until after Plaintiff applied for the Mechanic position in 2016.

extremity weakness, fatigue, dizziness, and balance problems, among other things—Washington became concerned about Plaintiff's ability to safely drive MAWSS vehicles while at work. Driving was occasionally required in the ASW II position Plaintiff held at the time, and more frequently required in the Mechanic position Plaintiff had applied for.

To address her concerns, Washington requested an updated FMLA form from Dr. Millette in late June 2016. Dr. Millette responded on July 17, 2016 with an FMLA form indicating that Plaintiff had a permanent condition (MS) that caused him to experience heat intolerance, as well as episodic symptoms of vision loss, fatigue, and "extremity weakness with spasticity" that occurred every three to six weeks and lasted three to five days per episode. Based on this new information about Plaintiff's symptoms and their frequency, Washington determined that it was hazardous— both to Plaintiff and to his co-workers and the general public—for Plaintiff to drive MAWSS vehicles while at work. Plaintiff was advised on August 9, 2016 that he was no longer permitted to drive at work or to operate any of MAWSS's vehicles or drivable equipment. Defendants sent Plaintiff a letter on August 19, 2016 that formalized the driving restriction and explained that the restriction had been imposed for Plaintiff's safety and to protect MAWSS from liability resulting from a possible accident.

Defendants accommodated Plaintiff in his ASW II job by removing all driving duties from that position and allowing Plaintiff to use a fan at work and take breaks as needed to address his heat

intolerance, but they determined that Plaintiff was not qualified for promotion to the Mechanic position. According to Defendants, driving is an essential function of the Mechanic position, and Plaintiff's driving restriction cannot be reasonably accommodated in that position. As mentioned, the job posting for the Mechanic position lists "test driving vehicles" and "operating a tow truck" as job duties and requires a qualified applicant to have a valid driver's license and be able to obtain a CDL. Consistent with the job posting, Sumrall testified that Mechanics are required to drive vehicles and equipment in the ordinary course of performing their essential duties, which include: diagnosing problems with and test-driving vehicles and equipment in the field, testing repairs in the garage and in the field, driving or otherwise transporting vehicles from the field to the garage for additional repairs if necessary, and responding to the location of emergencies such as sewer line backups and water line breaks.

Plaintiff argues that the driving restriction Defendants imposed on him was not based on objective medical information, but rather on Washington and King's misperceptions about his MS diagnosis. In support of his argument, Plaintiff cites a letter, purportedly written by Dr. Millette on October 20, 2016, stating that Plaintiff was "currently doing well" and that he had "no restrictions from his job duties or driving." Unlike Dr. Millette's prior communications regarding Plaintiff, the October 2016 letter was not sent by Dr. Millette directly to MAWSS, and there is no evidence that Washington, King, or any other HR employee received it.

Washington and King both deny receiving the letter, which is directed "To Whom it May Concern" with no listed addressee. Plaintiff testified in his deposition that he gave the letter to Sumrall, and we assume that is true for purposes of this appeal.[3] But Plaintiff admitted that he did not take the letter to HR or put it in interoffice mail, that he never discussed the letter with HR or asked whether Washington, King, or any other HR employee had received it, and that he did not know what Sumrall did with the letter after Plaintiff handed it to him.

Plaintiff also argues that Defendants could have accommodated his driving restriction in the Mechanic position in the same manner that they accommodated the restriction in the ASW II position. According to Plaintiff, Defendants could have promoted him to the Mechanic position and temporarily diverted his driving responsibilities in that position to other employees during his episodic MS flare-ups. Alternatively, Plaintiff argues that Defendants could have permanently removed his driving responsibilities in the Mechanic position, with "minimal disruption."

Between July and December 2016, Plaintiff repeatedly complained to Sumrall and other MAWSS garage supervisors that the driving restriction and his disqualification from the Mechanic position were discriminatory. There is evidence that at least some of Plaintiff's complaints were relayed to Washington and King, although Plaintiff does not clearly set out in his appellate brief the

---

[3] Sumrall denies receiving the October 2016 letter.

dates that occurred. Nevertheless, and despite his complaints, Plaintiff continued in his ASW II job at MAWSS without incident for several months after he was disqualified from the Mechanic position in August 2016.

On November 10, 2016, garage supervisor Norman Rollo asked Plaintiff to complete a repair on Rollo's personal vehicle in the MAWSS garage. According to Plaintiff, he and his MAWSS coworkers had a custom and practice of performing such personal repairs, which Plaintiff claims were permitted by MAWSS policy so long as the repairs were not done during work hours. Plaintiff claims that other MAWSS employees—including the employee who assisted Plaintiff with Rollo's repair—engaged in such personal work in the MAWSS garage on occasion. Plaintiff completed the repair to Rollo's personal vehicle on November 10, 2016, as requested.

On the next day, November 11, 2016, Plaintiff was involved in an incident that resulted in the theft of MAWSS property by Plaintiff's co-worker, Tim Turner. Prior to the theft, Plaintiff had pulled a pair of windshield wiper blades from the MAWSS garage in anticipation of completing a repair on Turner's work vehicle. Turner subsequently was caught and disciplined for stealing the windshield wiper blades. As part of Turner's disciplinary process, Washington reviewed a surveillance video of the incident in late

November 2016.[4]  The video showed Plaintiff pulling the windshield wiper blades without noting their removal in MAWSS's inventory system and placing them in a garage bay door where Turner later retrieved the blades, unsuccessfully tried to conceal them in his pants leg, and ultimately wrapped them in his jacket while leaving the garage—all in Plaintiff's presence.

After Washington reviewed the surveillance video of the incident involving Turner, Defendants engaged the outside investigation company ARCAS Investigations to conduct a targeted investigation of Plaintiff.  As requested by Defendants, ARCAS reviewed surveillance videos of Plaintiff's activities in the MAWSS garage during the relevant time frame and reported its findings to MAWSS in early December 2016.  ARCAS's report suggested that Plaintiff had aided Turner's theft of the windshield wiper blades on November 11, 2016, and that he had also performed a personal repair (the repair requested by Rollo) using MAWSS materials and while on MAWSS time on November 10, 2016.  Based on the report, MAWSS scheduled a disciplinary hearing for Plaintiff on January 26, 2017.  The hearing was rescheduled for February 9, 2017 per Plaintiff's request, so Plaintiff could retain an attorney.

Meanwhile, on February 6, 2017, Plaintiff filed an EEOC charge alleging disability discrimination and retaliation in violation of the ADA.  The EEOC notified MAWSS of the charge on

---

[4] Turner was placed on administrative leave because of the theft, and he subsequently retired.

February 9, 2017. This was the same date as Plaintiff's rescheduled disciplinary hearing, but there is no evidence that Washington, who coordinated Plaintiff's hearing and assisted with the presentation of evidence against him, or any other individual on Plaintiff's three-person disciplinary hearing panel, was aware of Plaintiff's EEOC charge at the time of the hearing on February 9, 2017.

Plaintiff raised issues of discrimination, retaliation, and disparate treatment during his February 9 disciplinary hearing, but evidence also was presented during the hearing indicating that: (1) Plaintiff had pulled the windshield wiper blades that Turner stole on November 11, 2016 without noting their removal in MAWSS's inventory system, and he had observed Turner trying to conceal the windshield wiper blades in his pants leg and then leaving the MAWSS garage with them and (2) Plaintiff had made a repair to Rollo's personal vehicle on November 10, 2016 while on MAWSS time and using MAWSS materials. Based on the evidence presented during the hearing, the hearing panel determined that Plaintiff had violated Personnel Board rules regarding conduct unbecoming a public employee and neglect of duty, and it recommended that Plaintiff be suspended for fifteen days without pay.

Plaintiff appealed the suspension to the Personnel Board, arguing that the discipline was excessive and retaliatory. Specifically, Plaintiff claimed that the suspension was imposed in retaliation for his internal complaints about disability discrimination. After a de novo hearing, the Board denied Plaintiff's appeal and upheld his suspension. In support of its decision, the Board cited evidence

presented during Plaintiff's disciplinary hearing that:  (1) Plaintiff had "repaired [a personal vehicle] for Rollo's private benefit while working on MAWSS time using public facilities" and materials contrary to MAWSS policy and (2) Plaintiff had stood by and watched while his co-worker Turner "brazenly concealed the [windshield] wipers [taken from MAWSS] first in his pants leg, then in his jacket."  The Board concluded that Plaintiff's unpaid suspension was an appropriate sanction because, although Plaintiff had been recognized as a good employee in the past, he had in these two recent instances "conduct[ed] personal work on public time" and "divert[ed] publicly purchased materials to further personal interests" in violation of Board rules.

Plaintiff claims that Defendants restructured his duties in September 2017, limiting him to small-engine repairs and sequestering him in the small-engine room.  Then, in October 2017, Plaintiff received an unsatisfactory service rating, resulting in his loss of a merit raise.  It is undisputed that Plaintiff's unsatisfactory service rating in October 2017 reflected—and was based solely on—his disciplinary suspension.  Plaintiff responded by filing a second EEOC charge and, subsequently, his complaint in this case.

In his complaint, Plaintiff asserts claims for disability discrimination and retaliation in violation of the ADA, and a claim for retaliation in violation of the First Amendment.[5]  Plaintiff asserted

---

[5] Plaintiff's complaint includes numerous other claims, including claims for disability discrimination and retaliation under § 504 of the Rehabilitation Act, ADA interference claims, an unauthorized medical inquiry claim under the

his discrimination and retaliation claims against MAWSS and against Washington and King individually.[6] Washington and King moved to dismiss Plaintiff's claims asserted against them individually on the ground of qualified immunity. Defendants subsequently moved for summary judgment as to all of Plaintiff's claims. In connection with the summary judgment motion, Defendants moved to strike Plaintiff's affidavit filed in response to their motion for summary judgment. The district court converted Washington and King's motion to dismiss to a motion for summary judgment and, after striking Plaintiff's affidavit in part, granted summary judgment to Defendants on all the claims asserted by Plaintiff. Plaintiff appeals the court's ruling on the motion to strike, as well as its ruling on the summary judgment motions.

---

ADA, a § 1983 claim for failure to supervise and train in violation of the Fourteenth Amendment, and state law claims for negligent supervision and training and invasion of privacy. The district court granted summary judgment on these claims, and Plaintiff did not raise the district court's ruling on these claims as an issue for appeal in his opening appellate brief. Accordingly, Plaintiff has waived his appeal of these claims, and we will not consider them. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (noting that an appellant abandons a claim that he fails to "specifically and clearly" identify in his opening brief as an issue on appeal).

[6] Plaintiff also asserted claims against Washington and King in their official capacity as MAWSS Human Resources officials, but those claims merge with his claims against MAWSS. *See Lewis v. Clarke*, __U.S.__, 137 S. Ct. 1285, 1290–91 (2017) ("[L]awsuits brought against employees in their official capacity represent only another way of pleading an action against an entity of which an officer is an agent[.]" (citation and quotation marks omitted)).

## DISCUSSION

### I.     Plaintiff's Affidavit Testimony

Plaintiff submitted an affidavit in his summary judgment response in which he stated, in relevant part, that he saw Sumrall place Dr. Millette's October 2016 letter in an envelope and then put the envelope in the "inbox" that was the customary way of delivering documents to HR.  Defendants moved to strike this statement under the sham affidavit rule, which allows a court to disregard affidavit testimony that "flatly contradicts" the affiant's "own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously."  *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016).  Plaintiff argues that the district court erred by granting the motion to strike, and that the error interfered with his ability to show that Defendants had notice in October 2016 that Plaintiff was medically cleared to drive.

### A.     Standard of Review

We review the district court's decision to strike Plaintiff's affidavit testimony for an abuse of discretion.  *See id.* at 1304 (noting that, as with other evidentiary decisions, this Court reviews a district court's decision to exclude affidavit testimony under the sham affidavit rule for an abuse of discretion).  A district court abuses its discretion when its ruling is based on "a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."  *See id.* (citation and quotation marks omitted).  We

will thus affirm the district court's ruling as to Plaintiff's affidavit testimony unless the court "made a clear error of judgment" or "applied an incorrect legal standard." *See id.* (citations and quotation marks omitted).

### B.    Analysis

We find no abuse of discretion here.  The district court correctly set out the applicable law, citing authority for the principle that the sham affidavit rule applies only in "a limited manner to exclude unexplained discrepancies and inconsistencies, as opposed to" ambiguities that "create an issue of credibility or go to the weight of the evidence." *See id.* at 1306 (citation and quotation marks omitted). *See also Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). The district court repeatedly emphasized that affidavit testimony must "directly contradict" the affiant's deposition testimony—rather than merely clarifying or supplementing the prior testimony—to be excluded under the sham affidavit rule.

Applying the sham affidavit rule as set forth above, the district court denied Defendants' motion to strike more than thirty paragraphs of Plaintiff's affidavit, after concluding that the statements made in those paragraphs did not "directly contradict" Plaintiff's deposition testimony, but merely raised credibility issues

about the facts asserted by Plaintiff. For example, the court declined to strike Plaintiff's affidavit testimony concerning, among other things: (1) the reason Plaintiff applied for FMLA leave, (2) the fact that Plaintiff's medical condition stabilized in June 2016, (3) whether Plaintiff submitted an FMLA form to Washington in June 2016 or an ADA accommodation request form in August 2016, (4) whether Plaintiff was properly certified for the Mechanic position after he submitted revised application materials to the Personnel Board, and (5) the efficacy of MAWSS's EEO policies and procedures.

The district court granted Defendants' motion to strike only as to Plaintiff's affidavit testimony describing what happened to Dr. Millette's October 2016 letter after Plaintiff delivered the letter to Sumrall. We agree with the district court that, on this one point, Plaintiff's affidavit testimony directly contradicts his prior deposition testimony. As discussed, the copy of the October 2016 letter produced by Plaintiff shows that Dr. Millette did not send the letter directly to MAWSS, as had been Dr. Millette's standard procedure for communicating with MAWSS in the past. The letter was addressed "To Whom it May Concern" and it made no reference to MAWSS, Washington, or King. When asked during his deposition about the delivery of the letter to MAWSS, Plaintiff stated that he gave it to Sumrall. Responding to a follow-up question concerning what Sumrall did with the letter, Plaintiff affirmatively stated, "That I do not know." Plaintiff then testified that he did not put the letter in interoffice mail because it was "not in an envelope."

And Plaintiff later confirmed that he did not ask HR about—or confirm that HR had received—the letter.

Testifying about this same subject in his affidavit, Plaintiff did a complete about-face. Specifically, Plaintiff stated in his affidavit that after he gave Dr. Millette's October 2016 letter to Sumrall, he saw Sumrall put the letter in an envelope and then place the envelope in the inbox, which was the customary way to deliver a document from the MAWSS garage to HR. That is not a clarification or supplementation but rather a complete repudiation of Plaintiff's prior deposition testimony, which appears to have been proffered for the purpose of manufacturing a question of fact as to whether Defendants were on notice of information suggesting that Plaintiff was medically cleared to drive at the relevant time. As such, the district court did not err by striking Plaintiff's statement in his affidavit regarding the delivery of Dr. Millette's October 2016 letter to HR.

## II.    The District Court's Summary Judgment Rulings

### A.    Standard of Review

We review the district court's order granting summary judgment de novo, applying the same legal standards as the district court. *See DeKalb Event Center, Inc. v. City of Chamblee, Georgia*, 15 F.4th 1056, 1059 (11th Cir. 2021). We construe the evidence, and draw all reasonable inferences, in favor of Plaintiff. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005). Viewing the evidence in that manner, summary judgment is warranted

if there are no genuine issues of material fact, and the evidence shows that Defendants are entitled to judgment as a matter of law. *Id.*

### B.    Plaintiff's ADA Discrimination Claims

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Plaintiff argues that Defendants violated the ADA when they: (1) disqualified him from being promoted to the Mechanic position in August 2016, and (2) restructured his duties in the ASW II position in September 2017 so that he was assigned to work primarily on small-engine repairs. For the reasons discussed below, we agree with the district court that Plaintiff cannot prevail on an ADA discrimination claim based on either ground.

#### 1.    Claims Against Washington and King Individually

We note as an initial matter that the ADA "does not provide for individual liability, only for employer liability." *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996). *See also Albra v. Advan, Inc.*, 490 F.3d 826, 830 (11th Cir. 2007) ("[I]ndividual liability is precluded for violations of the ADA's employment discrimination provision [.]"). Because there is no basis for holding Washington and King individually liable on Plaintiff's ADA discrimination

claims, we **AFFIRM** the district court's order granting summary judgment to Washington and King on those claims.

### 2.    Mechanic Promotion

To prevail on his ADA discrimination claim based on his disqualification from the Mechanic position, Plaintiff must show that: (1) he is disabled, (2) he is a "qualified individual" with respect to the relevant position, and (3) he was subjected to unlawful discrimination with respect to the position because of his disability. *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). Defendants concede that Plaintiff satisfies the first requirement because Washington and King regarded Plaintiff as physically impaired and limited in his ability to drive on account of his MS. And it is undisputed that Plaintiff was subjected to an adverse employment action when he was disqualified from the Mechanic promotion. But Defendants argue that Plaintiff cannot make out a claim for disability discrimination based on his disqualification from the Mechanic promotion because he cannot show that he was qualified to be a Mechanic. According to Defendants, driving is an essential function of the Mechanic position, and Washington and King reasonably concluded, based on the FMLA form provided by Dr. Millette in June 2016, that allowing Plaintiff to drive at work would pose a "direct threat" to the safety of himself and other individuals in the workplace and in the general public.

The ADA defines a "qualified individual" as a person who "with or without reasonable accommodation, can perform the essential functions" of the relevant position. *See* 42 U.S.C. § 12111(8).

Essential functions are those fundamental job duties that an individual who holds the position is in fact required to perform. *See Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1257 (11th Cir. 2007). When defining the essential functions of a position for purposes of the ADA, "consideration [is] given to the employer's judgment." 42 U.S.C. § 12111(8). In addition, "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.*

Whether an accommodation is reasonable depends on the circumstances, but the ADA does not require an employer to eliminate an essential function of a position to accommodate a disabled employee. *See D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005). Instead, an accommodation is only reasonable under the ADA if it enables an employee to perform the essential functions of a position. *See Holly*, 492 F.3d at 1262 n.16 ("[A]n accommodation that does not enable the employee to perform an essential function of his position is factually unreasonable and is not required by the ADA."). Further, an accommodation is not reasonable if it would impose an "undue hardship" on the employer. *See* 42 U.S.C. § 12112(b)(5)(A).

In addition to the above, an employee is not a qualified individual if, by performing the essential duties of the relevant position, he poses a "direct threat" to himself or others in the workplace. *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203 n.9 (11th Cir. 2021) (explaining that the direct threat defense "relates to whether the

employee is a qualified individual . . . because it focuses on whether the plaintiff can perform the essential functions of her job."). The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The applicable regulations have expanded the definition of a direct threat to include a risk to the health or safety of the employee himself. *See* 29 C.F.R. § 1630.2(r). An employer's determination that an individual poses a direct threat must be based on "reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *See id.* When the direct threat defense is raised, the employee bears the burden of proving either that he was not a direct threat or that reasonable accommodations were available to remove the threat. *See Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996) ("The employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available.").

The evidence is undisputed that driving is an essential function of the Mechanic position. As discussed above, the job description for the Mechanic position includes "test driving" vehicles and "operat[ing] a tow truck" among its primary duties, and it lists having a valid state driver's license and being able to obtain a CDL with appropriate endorsements, including an air brake endorsement, as a special requirement. Consistent with the job description, Sumrall testified that Mechanics have the primary responsibility for repairing disabled vehicles in the field, and that they are frequently called

upon to get to the location of a disabled vehicle in the field and transport the vehicle back to the MAWSS garage—either by driving or towing it—for additional repairs if necessary. Sumrall testified further that emergency situations such as sewer line backups and water line breaks often require a Mechanic to be on standby to travel to the scene and address equipment issues that occur there. Finally, Sumrall stated that a Mechanic regularly test drives vehicles—both in the field and in the garage—to diagnose problems and ensure repairs have been performed correctly.

It is further undisputed that Washington and King reasonably concluded, based on the updated FMLA form Dr. Millette submitted in June 2016, that allowing Plaintiff to drive MAWSS vehicles while at work would pose a direct threat to Plaintiff's own safety and to the safety of other individuals in the workplace. In pertinent part, and as set out above, the June 2016 FMLA form indicated that Plaintiff's MS: (1) was a permanent condition, (2) that episodically caused symptoms including loss of vision, fatigue, and extremity weakness with spasticity, (3) with episodes occurring every three to six weeks and lasting three to five days per episode. Defendants advised Plaintiff in August 2016 that his symptoms—particularly his symptoms of loss of vision, dizziness, fatigue, and extremity weakness with spasticity—presented "a safety hazard when operating MAWSS vehicles and equipment."

Plaintiff argues that Washington and King's assessment that he was unable to drive was based on their assumptions about his MS diagnosis rather than objective medical evidence. But as just

described, Washington and King determined that it would be hazardous to allow Plaintiff to continue driving MAWSS vehicles and equipment based on Dr. Millette's description of Plaintiff's symptoms—in particular, loss of vision, dizziness, and extremity weakness with spasticity—rather than on Plaintiff's MS diagnosis.  Dr. Millette's description of Plaintiff's symptoms was the "best . . . objective evidence" of Plaintiff's symptoms and their frequency available to Washington and King at the relevant time.  *See* 29 C.F.R. § 1630.2(r).

Plaintiff also argues that Dr. Millette's October 2016 letter medically cleared him to drive, despite his symptoms.  Even if Washington and King had seen the October 2016 letter, they might reasonably have concluded that it was hazardous for Plaintiff to drive at work, given his episodic symptoms of vision loss, dizziness, and extremity weakness.  But more importantly, Washington and King testified that they never received Dr. Millette's October 2016 letter, and Plaintiff has not presented any evidence to rebut their testimony on that point.  Contrary to his ordinary practice, Dr. Millette did not send the letter directly to MAWSS, as evidenced by the fact that the letter is unaddressed and directed "To Whom it May Concern."  Plaintiff testified in his deposition that he gave the letter to Sumrall and again, we assume that is true for purposes of this appeal.  Nevertheless, Plaintiff admitted in his deposition that he "d[id] not know" what Sumrall did with the letter.  Plaintiff further acknowledged that he did not take the letter directly to HR, put the letter in interoffice mail, which was the ordinary means of

transmitting documents to HR, or confirm that HR had ever received the letter.

Finally, Plaintiff argues that his perceived inability to drive could have been accommodated in the Mechanic position. As to this argument, Plaintiff has the burden of identifying an accommodation and showing that the accommodation is reasonable and would enable him to perform the essential functions of the Mechanic position. *See Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) ("The plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job in question."). An employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Frazier-White*, 818 F.3d at 1255–56 (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363–64 (11th Cir. 1999) ("[T]he initial burden of requesting an accommodation is on the employee. Only after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated against her.")).

The only accommodation suggested by Plaintiff is that Defendants limit his driving restriction to periods of time when Plaintiff is having an MS flare-up and his symptoms are active. Even assuming Plaintiff specifically demanded that accommodation at the relevant time—that is, when Defendants advised him that he was disqualified from the Mechanic position—the evidence in the

24                    Opinion of the Court                    20-14298

record shows that Plaintiff's proposed accommodation is not reasonable, and thus it is not required by the ADA. Again, it is undisputed that driving MAWSS vehicles and equipment is an essential function of the Mechanic position, and one that Mechanics frequently are called upon to do during the regular course of their job duties. Revoking Plaintiff's authorization to drive during his MS flare-ups—which Dr. Millette indicated can occur every three to six weeks and last for three to five days per episode—would not enable Plaintiff to perform the essential function of driving, but rather eliminate that essential function for significant portions of his time at work. As discussed above, the ADA does not require an employer to eliminate an essential function of a position, or alter the essential nature of a position, to accommodate a disabled employee. *See D'Angelo*, 422 F.3d at 1229.

In short, undisputed evidence in the record shows that: (1) driving is an essential function of the Mechanic position, (2) Defendants reasonably concluded that allowing Plaintiff to drive at work would pose a direct threat to Plaintiff himself or others in the workplace, and (3) Plaintiff failed to identify a reasonable accommodation that would enable him to perform the essential functions of the Mechanic position given his driving restriction. Accordingly, we **AFFIRM** the district court's order granting summary judgment to Defendants as to Plaintiff's ADA disability discrimination claim based on his disqualification from the Mechanic position.

### 2.    Assignment to Small-Engine Work

As to Plaintiff's assignment to work primarily on small-engine repairs in his ASW II position, Defendants do not dispute that Plaintiff was disabled and that he was qualified for the ASW II position he held when he was given the small-engine assignments at issue, but they argue that there is no evidence they discriminated against Plaintiff on account of his disability by giving him small-engine assignments, and we agree.   The undisputed evidence shows that small-engine repair was part of the routine work of the MAWSS garage that was shared among various ASW II employees and distributed as dictated by the needs of the garage.  To that end, multiple MAWSS garage supervisors testified that Plaintiff was not the only MAWSS employee who did small-engine work, but that his "name would come up first" for that type of work because he was "good at it."   Plaintiff did not present any evidence to rebut this testimony.  On the contrary, Plaintiff confirmed in his deposition testimony that he had worked in the small-engine area since 2015, prior to the time he submitted his FMLA paperwork advising Defendants of his MS diagnosis.

Sumrall did suggest in his testimony that he tended to direct small-engine assignments to Plaintiff as an informal accommodation for his illness, because those assignments allowed Plaintiff to work away from fumes.  But even assuming Plaintiff received more small-engine assignments because of his illness, Plaintiff does not cite any evidence to support his argument that the assignments were adverse in any way.  The ADA defines discrimination in terms

that relate to "the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *See* 42 U.S.C. § 12112(a). There is no evidence that Plaintiff's small-engine assignments had any effect on the "terms, conditions, and privileges" of his employment in the ASW II position. It is undisputed that small-engine work did not result in less pay, a less desirable schedule, diminished work responsibilities, or reduced opportunities for advancement. Thus, Plaintiff cannot establish the final element of his prima facie ADA discrimination claim—that is, discrimination because of his disability—with respect to the small-engine repair assignments he received while working as an ASW II. *See Holly*, 492 F.3d at 1256. As such, we **AFFIRM** the district court's order granting summary judgment to Defendants on Plaintiff's ADA discrimination claim based on his reassignment to small-engine repair duties.

### C.    Plaintiff's Retaliation Claims

In addition to disability discrimination, Plaintiff alleges retaliation in his complaint. Specifically, Plaintiff claims Defendants retaliated against him after he complained about disability discrimination, filed an EEOC charge alleging disability discrimination, and testified about disability discrimination at his own and Rollo's disciplinary hearings. We analyze Plaintiff's retaliation claims in three distinct categories, based on their varying legal underpinnings: (1) First Amendment retaliation, (2) adverse action retaliation in violation of the ADA, and (3) retaliatory hostile work environment in violation of the ADA. As discussed below, we agree with the

district court that Plaintiff's First Amendment retaliation and ADA adverse action retaliation claims are legally inadequate, and we therefore **AFFIRM** the court's decision to grant summary judgment as to those claims. As to Plaintiff's retaliatory hostile work environment claim under the ADA, neither the parties nor the district court applied the correct legal analysis to that claim. Accordingly, we **REMAND** Plaintiff's retaliatory hostile work environment claim to the district court for further proceedings consistent with this opinion.

### 1.        First Amendment Retaliation

#### a.        Claims Against Washington and King Individually

As is evident from the discussion above, Plaintiff's First Amendment claim is the only claim on which Defendants Washington and King are potentially liable in their individual capacity. *See Albra*, 490 F.3d at 830 (explaining that the ADA does not provide for individual liability). The district court determined that Washington and King were entitled to qualified immunity as to Plaintiff's First Amendment claims asserted against them individually. Plaintiff did not identify the qualified immunity ruling in his opening brief as an issue for appeal, nor did he offer any substantive argument on the qualified immunity issue in his opening brief. Accordingly, Plaintiff has waived any right to appeal the district's court qualified immunity ruling as to his First Amendment claims asserted against Washington and King individually, and we

**AFFIRM** the district court's order granting summary judgment as to those claims on that ground.

### b.    Claims Against MAWSS

For Plaintiff to prevail on his First Amendment retaliation claim against Defendant MAWSS, he must show that:  (1) he engaged in speech on a matter of public concern, (2) his First Amendment interest in the speech outweighed his employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees, and (3) his speech played a substantial part in an adverse employment action taken against him by MAWSS. *See Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759–60 (11th Cir. 2006).  Once Plaintiff establishes these factors, the burden shifts to MAWSS to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. *See id.* at 760.  "The first two elements are questions of law designed to determine whether the First Amendment protects the employee's speech.  The third element and affirmative defense are questions of fact designed to determine whether the adverse employment action was in retaliation for the protected speech." *Id.*

As to the first part of the analysis, Plaintiff's speech is entitled to constitutional protection only to the extent he "spoke as a citizen on a matter of public concern." *See id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).  Speech made primarily in Plaintiff's role as an employee is not protected by the First Amendment and cannot give rise to a First Amendment retaliation claim. *See id.*

Plaintiff has not shown that he spoke as a citizen on a matter of public concern when he complained internally about disability discrimination between July and December 2016, or when he filed EEOC charges alleging discrimination and retaliation. On the contrary, and as described in the complaint, the thrust of Plaintiff's internal complaints about discrimination and his subsequent EEOC charges concerned a matter of private interest—that is, Plaintiff's disqualification from a promotion he felt he was entitled to receive—rather than public concern. *See Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1165–68 (11th Cir. 2015) (denying First Amendment protection where the main thrust of the speech at issue concerned a personal employee grievance). As such, this speech is not protected by the First Amendment and cannot support Plaintiff's First Amendment retaliation claim. *See id.*

Plaintiff argues that his testimony at his own disciplinary hearing and at Rollo's disciplinary hearing in March 2017 qualifies as protected speech under *Lane v. Franks*, 573 U.S. 228, 238 (2014), in which the Supreme Court held that a public employee's truthful testimony, compelled by subpoena but given outside of the course of his ordinary job duties, was protected by the First Amendment. Assuming Plaintiff is correct, any First Amendment claim based on Plaintiff's testimony at the disciplinary hearings fails because there is no evidence Plaintiff's speech at the hearings played a substantial part in any adverse action MAWSS subsequently took against Plaintiff. Plaintiff's disqualification from the Mechanic promotion occurred in August 2016, prior to Plaintiff's testimony at the

hearings.  A disciplinary hearing panel determined that a fifteen-day suspension was warranted at the conclusion of Plaintiff's February 9 disciplinary hearing.  This decision was made prior to, and thus could not have been influenced by, Plaintiff's testimony at Rollo's hearing in March 2017.  The disciplinary decision obviously followed Plaintiff's testimony at his own hearing, but the decision was well-supported by the evidence presented at the hearing, and it was set in motion by an investigation that occurred in December 2016, again predating Plaintiff's hearing testimony.  Plaintiff received an unsatisfactory service rating and loss of a merit raise in October 2017, but it is undisputed that those adverse actions followed automatically from his disciplinary suspension.  The only other consequence Plaintiff claims resulted from his testimony at the disciplinary hearings is the small-engine assignments he received after he testified, but we have already explained that those assignments do not constitute an adverse employment action.

In short, most of the speech alleged by Plaintiff in support of his First Amendment retaliation claim concerns a personal, employment-related grievance rather than a matter of public concern. *See Alves*, 804 F.3d at 1165–68.  To the extent some part of his alleged speech arguably is protected by the First Amendment, Plaintiff has not shown that the speech played a substantial role in any adverse employment action Defendants subsequently took against him. *See Battle*, 468 F.3d at 759–60.  For these reasons, we **AFFIRM** the district court's order granting summary judgment on Plaintiff's First Amendment retaliation claim.

### 2.    ADA Retaliation

In addition to his First Amendment retaliation claim, Plaintiff asserts a retaliation claim arising under the ADA for the same adverse actions.  The ADA prohibits retaliation against an individual "because such individual has opposed any act or practice made unlawful [by the Act] or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act.  42 U.S.C. § 12203(a).  When an ADA retaliation claim is based on circumstantial evidence, as Plaintiff's claim is, we analyze the claim under the *McDonnell Douglas* burden-shifting framework.  *See Batson v. Salvation Army*, 897 F.3d 1320, 1328–29 (11th Cir. 2018).  Plaintiff must first establish a prima facie case of retaliation by showing that:  (1) he engaged in a statutorily protected expression, (2) he suffered an adverse action, and (3) there was a causal link between the two.  *See id.* at 1329.  The burden then shifts to Defendants to articulate a legitimate, non-retaliatory reason for their actions.  *See id.*  Assuming Defendants meet their burden, Plaintiff must produce evidence showing that the rationale asserted by Defendants is a pretext for retaliation to avoid summary judgment.  *See id.*

We assume Plaintiff has established a prima facie case of ADA retaliation. Defendants do not dispute that Plaintiff engaged in conduct that is statutorily protected by the ADA when he complained internally about disability discrimination during the latter part of 2016, and when he subsequently filed EEOC charges and raised the issue of disability discrimination during his own and

Rollo's disciplinary hearings in February and March 2017. It is also undisputed that Plaintiff suffered an adverse action when he was disqualified from the Mechanic promotion in August 2016 and when he was suspended after a disciplinary hearing in February 2017, which suspension resulted in Plaintiff receiving an unsatisfactory service rating and the loss of a merit raise in October 2017.[7] We assume, without deciding, that Plaintiff likewise has shown that the adverse actions were not "wholly unrelated" to his protected conduct, as required to establish a prima facie case of retaliation. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (applying the "not wholly unrelated" causation standard at the prima facie stage of the *McDonnell Douglas* analysis) (quotation marks omitted).

Defendants have articulated a legitimate, nonretaliatory reason for each of the adverse actions taken against Plaintiff. As to Plaintiff's disqualification from the Mechanic promotion, Defendants explain that Washington and King imposed a driving restriction based on Dr. Millette's description of Plaintiff's MS-related symptoms in July 2016, which restriction meant Plaintiff was unable to perform the essential functions of the Mechanic position.

---

[7] Plaintiff argues that the restructuring of his job duties to include only small-engine repairs in September 2017 also qualifies as an adverse action for purposes of his ADA retaliation claim. As discussed in relation to Plaintiff's disability discrimination and First Amendment retaliation claims, there is no evidence that assigning Plaintiff to small-engine work was in any way adverse. Thus, we do not consider the assignment an adverse action for purposes of Plaintiff's ADA retaliation claim.

Regarding Plaintiff's fifteen-day disciplinary suspension in February 2017, Defendants note that the suspension was recommended by a three-person hearing panel at the conclusion of Plaintiff's disciplinary hearing, during which hearing Plaintiff admitted both that he had performed a personal vehicle repair while on MAWSS time and using MAWSS materials and that he had stood by while a co-worker tried to conceal and ultimately stole MAWSS inventory. Finally, Defendants explain that Plaintiff's unsatisfactory service rating and loss of a merit raise in October 2017 followed automatically from his disciplinary suspension. The legitimate, nonretaliatory reasons proffered by Defendants for each of the adverse actions taken against Plaintiff easily satisfy their burden at the second stage of the *McDonnell Douglas* framework. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (noting that the employer's burden to articulate legitimate, nonretaliatory reasons for its actions "is merely one of production").

Plaintiff presents no evidence that the rationale proffered by Defendants to explain his disqualification from the Mechanic promotion was a pretext for retaliation. It is undisputed that Washington and King determined Plaintiff was not qualified for the Mechanic position because of the driving restriction they imposed on Plaintiff after Dr. Millette provided updated information to MAWSS in July 2016 about Plaintiff's MS-related symptoms. We have rejected Plaintiff's argument that the driving restriction was discriminatory, and we likewise reject his argument that the restriction was retaliatory. Indeed, the driving restriction cannot

have been retaliatory because it was the subject of—and the impetus for—Plaintiff's internal complaints about disability discrimination, which is the only protected conduct Plaintiff engaged in before he was disqualified from the Mechanic promotion.

As to Plaintiff's February 2017 suspension—as well as the October 2017 unsatisfactory service rating and loss of merit raise that followed automatically from the suspension—it is undisputed that the suspension was imposed by a three-person hearing panel at the conclusion of Plaintiff's disciplinary hearing conducted on February 9, 2017.  The panel was aware that Plaintiff had complained internally about disability discrimination because Plaintiff testified to that fact during the hearing.  However, there is no evidence that Plaintiff's prior internal complaints about discrimination influenced the panel's decision as to the appropriate discipline to impose on Plaintiff.  On the contrary, all the evidence in the record indicates that the hearing panel decided that a fifteen-day suspension was warranted based on evidence presented at the hearing—including video surveillance footage and Plaintiff's own testimony—showing that Plaintiff violated Personnel Board rules by completing a personal vehicle repair on MAWSS time and using MAWSS materials and that he aided and abetted theft of MAWSS inventory when he stood by while his co-worker tried to conceal and then stole a pair of windshield wipers that Plaintiff had previously pulled from the garage without noting their removal in the MAWSS inventory system.

Plaintiff claims he was selectively targeted for discipline, but he does not present any evidence to support that claim.  It is undisputed that the other parties involved in the incidents for which Plaintiff was disciplined—Rollo and Turner—were themselves disciplined: Turner was forced to retire, and Rollo was suspended. Plaintiff also points out that his co-worker Jason Simon was in the MAWSS garage when Turner stole the windshield wipers, but there is no evidence that Simon pulled the windshield wipers from MAWSS's inventory without noting their removal and then stood idly by while Turner blatantly tried to conceal and subsequently stole the wipers in Simon's presence.  Finally, Plaintiff notes that MAWSS garage employees had a custom and practice of performing minor personal repairs and that Sumrall had engaged in this practice himself.  Assuming that is true, it does not account for the fact that Plaintiff was disciplined for both performing a personal repair and aiding and abetting a co-worker's theft.  Moreover, there is no evidence that any HR employees—including Washington and King, who initiated Plaintiff's discipline—were aware of the personal repair practice in the MAWSS garage, which Plaintiff does not deny violated Personnel Board rules.

In short, Plaintiff presents no evidence from which a jury could reasonably conclude that he was selectively targeted for discipline or disciplined unfairly in retaliation for his complaints about disability discrimination.  Nor does Plaintiff present any other evidence that could fairly be interpreted to suggest that the explanations proffered by Defendants for Plaintiff's disqualification from

the Mechanic promotion and his subsequent fifteen-day discipli-
nary suspension are pretextual, and that retaliation is the real rea-
son for either of those adverse actions.  As such, Plaintiff's ADA
retaliation claim fails.

### 3.    Retaliatory Hostile Work Environment

Finally, Plaintiff asserts a retaliatory hostile work environ-
ment claim against Defendants under the ADA.  Specifically, Plain-
tiff claims that Defendants subjected him to a "hostile, offensive,
and abusive working environment" because of his internal com-
plaints about disability discrimination between July and December
2016, in violation of the ADA's anti-retaliation provision.  This
Court has not specifically held that a retaliatory hostile work envi-
ronment claim is cognizable under the ADA, but it has held that
such a claim is available under Title VII. *See Monaghan v. World-
pay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020).  The anti-retaliation
provisions of the ADA and Title VII are nearly identical. *Compare*
42 U.S.C. § 12203(a) ("No person shall discriminate against any in-
dividual because such individual has opposed any act or practice
made unlawful by [the ADA] or because such individual made a
charge, testified, assisted, or participated in any manner in an in-
vestigation, proceeding, or hearing under [the ADA].") and 42
U.S.C. § 2000e-3(a) (making it unlawful for an employer "to dis-
criminate against" an individual because such individual "has op-
posed any practice made an unlawful employment practice by [Ti-
tle VII], or because he has made a charge, testified, assisted, or par-
ticipated in any manner in an investigation, proceeding, or hearing

under [Title VII].").  Thus, we assume that Plaintiff's retaliatory hostile work environment claim is cognizable under the ADA, and that the same standard applies to that claim as would apply to a similar claim under Title VII.

Until recently, this Court had applied the "severe or pervasive" standard to a Title VII retaliatory hostile work environment claim, requiring a plaintiff asserting such a claim to show that he experienced harassment on account of his protected conduct that was "sufficiently severe or pervasive to alter the terms and conditions" of his employment.  *See Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012).  In *Monaghan*, the Court rejected the standard formerly applied in *Gowski*, and held that a plaintiff can prevail on a retaliatory hostile work environment claim under Title VII by showing, in addition to the other elements required to establish a retaliation claim, that the alleged retaliatory conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" under Title VII.  *Monaghan*, 955 F.3d at 857 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (quotation marks omitted and alterations adopted)).

The district court and the parties below analyzed Plaintiff's retaliatory hostile work environment claim under the "severe or pervasive" standard applied prior to *Monaghan.*  Defendants continue to rely on the severe or pervasive standard in their appellate brief, while Plaintiff cites *Monaghan* in his appellate brief.  As made clear in *Monaghan*, the proper standard for analyzing a retaliatory hostile work environment claim is the "well might have dissuaded"

standard announced in *Burlington Northern* rather than the "severe or pervasive" standard of *Gowski*. *See id*. We thus remand Plaintiff's retaliatory hostile work environment claim to the district court to give the parties an opportunity to brief, and that court the opportunity to consider in the first instance, the claim under the correct legal standard.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's order granting summary judgment as to Plaintiff's ADA discrimination claim and all his retaliation claims except his ADA retaliatory hostile work environment claim. We also **AFFIRM** the district court's order granting summary judgment to Washington and King as to all claims asserted against them in their individual capacity, on the ground that Plaintiff has not argued and has thus abandoned his appeal of the district court's order granting qualified immunity to Washington and King. As to Plaintiffs retaliatory hostile work environment claim asserted under the ADA, we **REMAND** that claim to the district court to consider under the standard recently applied by this Court in *Monaghan.*